INTERSTATE BROADCASTING COM-
PANY, Inc., Appellant,

v.

FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,
E. Weaks McKinney-Smith, Intervenor.

No. 14391.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 4, 1958.

Decided March 19, 1959.

Mr. Maurice M. Jansky, Washington, D. C., for appellant.

Mr. Richard M. Zwolinski, Counsel, Federal Communications Commission, with whom Mr. Richard A. Solomon, Assistant General Counsel, Federal Communications Commission at the time the brief was filed, was on the brief for appellee. Messrs. Edgar W. Holtz, Acting General Counsel, Federal Communications Commission, and John J. O'Malley, Jr., Counsel, Federal Communications Commission, also entered appearances for appellee.

Mr. John B. Kenkel, Washington, D. C., with whom Mr. Arthur H. Schroeder, Washington, D. C., was on the brief, for intervenor.

Before FAHY, DANAHER and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

Intervenor on April 20, 1954, applied for a construction permit for a new radio broadcast station on a frequency of 1560 kc. at Paducah, Kentucky. There was then on file an application of Tennessee Valley Broadcasting Company (herein, Tennessee) seeking to change the facilities of its station at Chattanooga to permit of its use of a frequency of 1560 kc.

Tennessee later amended its application to specify a use of that frequency at Fort Oglethorpe, Georgia. The Commission designated the applications of intervenor and Tennessee for comparative hearing in a consolidated proceeding, and appellant was named as a party therein, for it was the licensee of Station WQXR, already operating on 1560 kc. at New York City.

Five issues were specified in the hearing order. Issue 4 dealt with the comparative qualifications of intervenor and Tennessee, while issue 5 directed for determination "in the light of § 307(b) of the Communications Act of 1934, as amended, which, *if either,* of the subject proposals would provide the *more* fair, efficient and equitable distribution of radio service." (Emphasis added.) Before hearing Tennessee sought and was granted a dismissal of its pending application. Intervenor requested the deletion of the comparative issues 4 and 5, and further sought either a modification or deletion of issue 3. The Commission amended its hearing order accordingly, specifying as issues:

1. To determine the areas and populations which may be expected to gain or lose primary service from the operation of the stations (sic) as proposed, and the availability of other primary service to such areas and populations.

2. To determine whether the subject proposed operations (sic) would involve objectionable interference with the existing or the authorized (File No. BP-4506) operation of Station WQXR, New York City, N. Y., or with any other existing standard broadcast station, and, if so, the nature and extent of such interference.

3. To determine whether the operation proposed by [Intervenor] E. Weaks McKinney-Smith would be in compliance with the provisions of Section 3.28(c) of the Commission's Rules, and, if not, whether circumstances exist which, as determined by the Commission in the public interest, warrant a waiver of said rule.

After formal hearing on the intervenor's application with full participation by the appellant as a party thereto, the Examiner released his Initial Decision. Both appellant and intervenor filed exceptions. After oral argument, the Commission on February 14, 1957, released its decision granting the intervenor's application to operate a class II facility. Appellant petitioned for rehearing raising substantially the same points it urges here. On February 28, 1958, the Commission released its Memorandum Opinion and Order denying the appellant's petitions for rehearing and for a stay.

Against the background thus generally stated, appellant urges here that the Commission erred: in deleting issue 5, supra, and thereafter basing its grant of intervenor's application upon § 307(b); with respect to issue 3, supra, in waiving Rule 3.28(c)[1] of its Rules and Regulations; and in its allegedly departing from the definition of "primary service" (as contained in the Commission's Rules) as the Commission considered the availability of other primary services to intervenor's proposed primary service area.

### I

■ After the dismissal of Tennessee's application, there was no longer need for a comparative hearing as to the respective qualifications of intervenor and Tennessee or for a determination as to which "if either" of the two applicants might the better establish its right within the meaning of § 307(b).[2] In this latter particular it remained simply for the Commission to determine whether or not the public interest required the granting of intervenor's application so as to provide "a fair, efficient, and equitable distribution of radio service" among the several states and communities. That § 307(b) criterion persisted as a prerequisite to be met in any event, just as § 303(g) imposed upon the Commission the duty generally to "encourage the larger and more effective use of radio in the public interest." The "public interest" touchstone was that prescribed by Congress, a requirement always permeating the Commission's administration of the Act whether there be one applicant or many for a particular facility. Upon the Commission devolved the burden not only of supervising radio traffic but of determining the composition of that traffic. "The facilities of radio are not large enough to accommodate all who wish to use them. Methods must be devised for choosing from among the many who apply. And since Congress itself could not do this, it committed the task to the Commission." National Broadcasting Co. v. U. S., 1943, 319 U.S. 190, 216, 63 S.Ct. 997, 1009, 87 L.Ed. 1344.

Accordingly, the Commission concluded on the basis of the extensive record

1. 47 C.F.R. 3.28(c) (1958) provides:
"Upon a showing that a need exists, a Class II, III or IV station may be assigned to a channel available for such class, even though interference will be received within its normally protected contour; *Provided:* (1) No objectionable interference will be caused by the proposed station to existing stations or that if interference will be caused, the need for the proposed service outweighs the need for the service which will be lost by reason of such interference; and (2) primary service will be provided to the community in which the proposed station is to be located; and (3) the interference received does not affect more than 10 percent of the population of the proposed station's normally protected primary service area. However, in the event that the nighttime interference received by the proposed station would exceed this amount, then an assignment may be made if the proposed station would provide either a standard broadcast nighttime facility to a community not having such a facility or if 25 percent or more of the nighttime primary service area of the proposed station is without primary nighttime service."

2. 47 U.S.C.A. § 307(b) provides:
"In considering applications for licenses, and modifications and renewals thereof, when and insofar as there is demand for the same, the Commission shall make such distribution of licenses, frequencies, hours of operation, and of power among the several States and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."

here compiled, that a more equitable distribution of radio facilities would result, agreeably to the mandate of § 307(b). Obviously the Commission could have reached no such conclusion if the intervenor had failed to establish that the ever-present requirements of § 307(b) had been met.

Appellant would have us say that when the Commission deleted issue 5, supra, appellant was thereby and thereafter deprived of due process insofar as the Commission nevertheless relied upon § 307(b) considerations in making the award. The immediate rejoinder is that § 307(b) was never out of the case. Appellant has failed to recognize the necessity for a determination as to whether or not one of two locations might the better serve if *any* new service were to be authorized. Thus location was an issue in the consolidated hearing. Surely, under § 307(b), various factors such as the problems posed by Cuban stations might have militated against an award to Tennessee for new construction at Fort Oglethorpe, Georgia. Such an issue was a phase—an important phase—of the comparative hearing involving Tennessee and the intervenor, but it might have developed that *neither* of the "subject proposals" could be granted. It is in this context that issue 5 was first inserted, and so must its deletion be understood. Thereafter it was still essential for the intervenor to show and for the Commission to determine that the § 307(b) criteria could be and had been satisfied as to the Paducah site.

Thus when the hearing went forward solely on intervenor's application, appellant was still a party, but at least comparative considerations were no longer at issue. Thereupon the intervenor not only had to prevail on all three specified remaining issues which clearly comprehended § 307(b) criteria, but it had to do so with specific reference to the authorized operations of Station WQXR and, for that matter, "with *any other* existing standard broadcast station." (Emphasis added.)

Unless it could be demonstrated that a permit might be authorized within the scope of issues 1 and 2, as to WQXR and other such stations, it clearly would follow that the Commission could not in the public interest have made a permissible grant within the limitations of § 307(b). Moreover, appellant participated fully in the hearings, offering evidence, cross examining witnesses, filing briefs, and joining in argument, in the filing of exceptions and otherwise. Again, appellant fully explored the issues in its "Petition for Reconsideration." The record is barren of any indication whatever that appellant was denied any right as a party. The record before the Commission, and of course before this court, demonstrates additionally that appellant has never made the slightest proffer of any evidence it might have possessed which it was denied an opportunity to present either before the Examiner or, in connection with its petition for reconsideration, before the Commission. Moreover, appellant makes no proffer here and no suggestion of any particular which would militate against the Commission's conclusion that its award of a construction permit at Paducah is in the public interest within the meaning of § 307(b).

**II**

■ Appellant next insists that the Commission is rigidly bound by the provisions of its Rule 3.28(c), supra note 1. This rule clearly contemplates that a § 307(b) finding may be made under prescribed circumstances, including as here pertinent a showing of compliance with the "10% rule," and that "25 percent or more of the nighttime primary service area of the proposed station is without primary nighttime service." Appellant would have us say as a matter of law that failure in such respects is an absolute bar to a grant. In this view, it is argued that the application should have been denied outright, without more. Thus appellant would convert a mere gauge established by rule into a straight-jacket, precluding all further action. That simply is not the law, as we have pre-

viously stated. "As for the ten per cent rule itself, the Commission has long recognized that it specifies only a norm, not a hard and fast rule. Both in authorizing and refusing to authorize departures from the ten per cent Standard, the Commission has frequently stated that the governing criterion is the public interest." [3]

The Supreme Court has recognized the need for flexibility in the Commission's administration of its rules. Thus,

"The problems with which the Commission attempted to deal could not be solved at once and for all time by rigid rules-of-thumb. The Commission therefore did not bind itself inflexibly to the licensing policies expressed in the Regulations. In each case that comes before it the Commission must still exercise an ultimate judgment whether the grant of a license would serve the 'public interest, convenience, or necessity.' If time and changing circumstances reveal that the 'public interest' is not served by application of the Regulations, it must be assumed that the Commission will act in accordance with its statutory obligations." [4]

Applying this principle, the Commission had adopted appropriate rules such as Section 1.15,[5] which in pertinent part provides that "any provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefor is shown." Here the intervenor not only asked for a waiver of Rule 3.28(c), but its petition was granted and the request was included as part of issue 3, supra. This action clearly comports with the Rule which provides that an application, otherwise at variance with the prescribed requirements, will not be considered defective if accompanied by a request for waiver.[6]

### III

We pass to the public interest aspect of the instant case having in mind the Commission's duty under the Act generally, and particularly under § 307 (b), supra note 2, "to provide a fair, efficient, and equitable distribution of radio service * * *." The Commission's Rule 3.24(b) [7] provides in pertinent part that an authorization for a new standard broadcast station will be made only after a showing, *inter alia*, "(2) That objectionable interference will not be caused to existing stations or that if interference will be caused *the need for the proposed service outweighs the need for the service which will be lost* by reason of such interference." (Emphasis supplied.)

The problem here turns upon many intricate facts, intertwined in their bearing upon the grounds for waiver, supra, and upon the public interest determination required by § 307(b). To illustrate, in terms of the waiver of § 3.28(c), the Commission found [8] that the intervenor's facility at Paducah would provide a first primary service to more than 6,000 persons in Metropolis, Illinois, only eight miles from Paducah, and a first primary service to some 12.9% of intervenor's proposed nighttime service area. A first

3. Beaumont Broadcast. Corp. v. Federal Communications Comm., 1952, 91 U.S. App.D.C. 111, 115–116, 202 F.2d 306, 310. The standards of permissive interference were established merely as a guide. Cf. Harrell v. Federal Communications Commission, 1959, 105 U.S.App. D.C. —, — F.2d —.

4. National Broadcasting Co. v. U. S., 1943, 319 U.S. 190, 225, 63 S.Ct. 997, 1013, 87 L.Ed. 1344.

5. 47 C.F.R. 1.15 (Rev.1958). Again we have recognized the application of such rules. See, e. g., City of New York Municipal B. System v. Federal Communications Comm., 1955, 96 U.S.App.D.C. 172, 173, 223 F.2d 637, 638.

6. Id., 1.307(a) (Rev.1958). Cf. former Rules 1.361(c) and 1.702 expressly recognized in United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 201, note 9, 76 S.Ct. 763, 769, 100 L.Ed. 1081, and applied Id. 351 U.S. at page 205, 76 S.Ct. at page 771.

7. 47 C.F.R. 3.24(b) (Rev.1958).

8. 13 Pike & Fischer Radio Reg. 477, 483–84, 487.

local primary service would be afforded to some 10,000 people. The facility would provide a third transmission service to Paducah and a third nighttime primary service to Paducah. Thus the deviations from the requirements of § 3.28(c) were found to be justified in the public interest because of the gains cumulatively established by the series of factors enumerated, especially when considered in relation to the insubstantial loss to WQXR.[9]

It may be noted that Paducah is 822 miles from New York City. The Commission found that the proposed Paducah operation would not result in objectionable daytime interference to the primary service area of WQXR. The loss in the nighttime primary service of WQXR would prevail over an area of less than 524 square miles, the Commission found,[10] and to a population of about 76,618, less than 1% of the population served by WQXR at night. But the interference area is 100% served by some and substantially served by others of five other class I stations located in New York City, and primary service is additionally available to varying portions of the interference area from 20 other stations.

The Commission found additionally that the proposed facility would serve an area of some 1,780 square miles with a population of some 100,283 gaining daytime service. At night, 47% of the area gaining service is served by a class IV station, WKYB, and 26% of the same area is served by a class III station, WPAD. WSM, 125 miles from Paducah reaches a part of the area. But the new station would render a primary nighttime service to some 49,319 people, would provide a first local primary service to 49.5% of the proposed service area including a population of some 10,000, 60% of whom are without any primary service. Thus the Commission concluded, Paducah with some 33,000 population

would receive a third transmission service both day and night, and a third nighttime primary service providing that populace with a multiple choice of nighttime programs. Additionally a second local primary service would be available to more than 6,000 people, some of whom would receive a second primary service. Importantly, Paducah would receive a third competitive service. Such factors, said the Commission, "demonstrate a compelling need for the service proposed." [11]

We agree, particularly since the record abundantly supports the Commission's conclusion that the need for the new service far outweighs its need for such a small percentage of WQXR service as might be lost. We need not go into further detail, since the evidence as to the area and population gaining new and different service sufficiently demonstrates the rationale upon which the Commission based its award which we deem consistent with our decisions and with its own.

## IV

But appellant next argues, the foregoing facts and conclusions should not control since the depend upon an erroneous definition of what constitutes "primary service." In appellant's view the Commission should have found that with the exception of Metropolis, Illinois, all of the intervenor's proposed nighttime service area receives a primary service from Stations WSM, WHAS and KMOX. Appellant argues that the Commission's conclusion stems from its ruling that 500 microvolts per meter is the outer limit of the primary service of existing broadcast stations. Had the Commission accepted appellant's claims in this respect, it would have been bound to say that the Rules define the outer limits of "primary service" as 100 mv/m, it is urged.

The Examiner on the record made by both parties with participation by the Broadcast Bureau, extensively explored

9. Cf. Beaumont Broadcast. Corp. v. Federal Communications Comm., supra note 3.

10. 13 Pike & Fischer Radio Reg. 477, 484–85, 487.

11. Id. at 485.

the problem thus posed. He found that the "Commission's standards for the co-channel protection of Class I-B stations [such as WQXR] during nighttime hours provide that protection from objectionable interference is to be afforded the 500 uv/m 50% contours of such stations [citing Table IV, Standards of Good Engineering Practice]. The Standards specify no co-channel protection rule for the nighttime groundwave service of Class I-B stations. This omission was plainly not made with the intention that the nighttime groundwave service should not be protected, but on the assumption that the 500 uv/m groundwave contour of each such station fell within the 500 uv/m-50% skywave contour of the station, and that protection of the skywave contour would automatically result in the adequate protection of the groundwave." [12]

The record shows that both the intervenor and the appellant quite agreed that the WQXR groundwave should receive protection. They differed as to whether protection should be afforded "on the basis of an RSS calculation or on the basis of considering single signals only." The Examiner had concluded that WQXR in seeking protection of its *groundwave* service was "attempting to exact protection for this service in excess of that to which its skywave signal is entitled under the Argus Press ruling [6 RR 173]."

The Commission considered the problem in the light of the extensive engineering record, not only with respect to appellant's exception to the Examiner's decision, but on appellant's petition for rehearing. Appellant now asks the court to accept its position arguing that the Commission "was obviously confused."

The Commission in its Conclusion 16 ruled:

"The respondent has also excepted to the Examiner's failure to find that the proposed nighttime service area lies within the 100 uv/m groundwave contours of three Class I stations; and that these stations render primary service to the proposed service area. In support, respondent states that the Commission held in the WDZ Broadcasting Company case, 7 RR 443, that objectionable fading is not a factor in determining primary service areas; and that a signal intensity of 0.1 mv/m constitutes primary service in rural areas as provided by § 3.182(f) of the Commission's Rules. In the case cited, the Commission did hold that consideration of objectionable fading would not be a factor in determining primary service areas, and still adheres to that ruling. However, of significance here, is the fact that the Commission has not held that a signal intensity of 0.1 mv/m constitutes primary service in a situation of this kind, but on the contrary has ruled consistently that the primary service of Class I stations at night is limited to their 0.5 mv/m groundwave contours. In the Courier-Journal & Louisville Times Co. case, 5 Pike & Fischer 348, the Commission stated, in part, as follows: 'The Commission's Standards of Good Engineering Practice provide that a Class I-A station is to be protected to its 0.5 mv/m groundwave contours both day and night from adjacent channel stations and to its 0.1 mv/m contour during the day from co-channel stations. Hence, according to the Commission's Standards, the primary service of a Class I-A station at night is based upon its 0.5 mv/m contour.' Thus on the ground that a signal of 0.1 mv/m does not constitute primary service the exception is denied."

On rehearing, the Commission pointed out that appellant's position had been fully considered, as above noted, and

12. The Commission adopted this finding *in toto*, citing the Table in its Rule 47 C.F.R. 3.182(v). It pointed out also that Rule 47 C.F.R. 3.182(i) provides that *secondary* service is delivered in the areas where the skywave for 50% or more of the time has a field intensity of 500 uv/m or greater.

decided adversely to its claims. It reiterated its conclusion as to the signal which constitutes primary service from Class I stations at night. It has thus flatly held in the light of its Rules as compared with its prescribed Standards of Good Engineering Practice and in reliance upon both, as well as upon its prior rulings, "that the primary service of Class I stations at night is limited to their 0.5 mv/m groundwave contours." Whether a single signal rule should be applied only in computing skywave interference to skywave service, or a different rule should be utilized in computing skywave interference to groundwave service, present questions which are peculiarly within the Commission's expert competence.

We are satisfied that in this highly technical field the Commission's construction and application of its own Rules

and Standards of Engineering Practice should be entitled to great weight. There is warrant in the record for the judgment of the expert body,[13] and the court should be slow to interfere where administration of the communications field has been invested in the Commission with broad powers.[14]

In sum, the Commission has here decided that the Paducah intervenor should be allowed a license so as to provide a fair distribution of facilities within the meaning of Section 307(b).[15] It has done so on a record which supports its action. Appellant was named as a party and has participated fully in all proceedings.[16] The final decision was within the Commission's competence, and finding no error of law, we are bound to affirm.[17]

FAHY, Circuit Judge, concurs in the result.

13. Rochester Tel. Corp. v. United States, 1939, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147.

14. United States v. Storer Broadcasting Co., 1956, 351 U.S. 192, 203, 76 S.Ct. 763, 100 L.Ed. 1081.

15. F.C.C. v. Allentown Broadcasting Co., 1955, 349 U.S. 358, 362, 75 S.Ct. 855, 99 L.Ed. 1147; cf. Harrell v. Federal Communications Commission, supra note 3.

16. Federal Communications Comm. v. WJR, 1949, 337 U.S. 265, 278, 69 S. Ct. 1097, 93 L.Ed. 1353.

17. Federal Communications Comm. v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 144, 60 S.Ct. 437, 84 L.Ed. 656.