**JAMES S. RIVERS, INC., (WJAZ),**
Appellant,

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee.**

**No. 19076.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 10, 1965.

Decided Aug. 24, 1965.

Petition for Rehearing en Banc and for
Rehearing before the Division
Denied Nov. 3, 1965.

Mr. Philip M. Baker, Washington, D.
C., with whom Mr. Arthur Scheiner,
Washington, D. C., was on the brief, for
appellant.

Mr. Joseph A. Marino, Counsel, Fed-
eral Communications Commission, with
whom Messrs. Henry Geller, General
Counsel, and John H. Conlin, Associate
General Counsel, Federal Communica-
tions Commission, were on the brief, for
appellee. Mr. Daniel R. Ohlbaum, Depu-
ty General Counsel, Federal Communica-
tions Commission, also entered an ap-
pearance for appellee.

Before BAZELON, Chief Judge, and
McGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

Before us for review is a decision by
the Federal Communications Commis-

sion [1] to deny petitioner's request for authority to operate its existing daytime AM radio station (WJAZ) in Albany, Georgia, at night as well. This determination was reached after full hearing, and no procedural issues are pressed upon us by petitioner. The controversy turns upon the question of whether the Commission acted arbitrarily and beyond the bounds of its discretion in refusing to waive a conceded conflict between the authority sought and the Commission's so-called 10 per cent rule. 47 C.F.R. § 73.28(d) (3) (1965). We are not persuaded that it did.

## I

When petitioner's application was filed, its examination by the Commission resulted in a finding that it qualified for granting in all respects except that of the 10 per cent rule. It was, therefore, set for hearing on that issue. Petitioner's own evidence confirmed and established the violation to be a substantial one.[2] Thus, the precise question was whether the Commission should waive its rule in this instance. The Examiner recommended waiver, giving three principal reasons therefor:

1. The proposed service would reach a "white area" (*i. e.*, one with no standard broadcast service at all) in Albany's business and factory area, involving 6,231 persons.

2. A "gray area" (*i. e.*, one with only one primary service) of 41,182 persons would be reached.

3. Petitioner's past and proposed programming, because of its allotments of time to the colored community, commendably furthered local self-expression.

The Broadcast Bureau excepted to the Examiner's report. It flatly challenged the accuracy of the Examiner's first point, asserting that the so-called "white area" was not so at all since it was already receiving a primary service within the meaning of the Commission's Rules. It argued that the evidence relied upon by the Examiner for his third point was not such as to show programming circumstances sufficiently unusual as to justify a waiver.

The Review Board concluded to withhold the waiver. It held that there was

---

1. Two orders are brought to us for review: one is that of the Commission's Review Board, denying petitioner's application for licensing authority, and the other is that of the Commission, denying petitioner's application for review of the Board's decision by the Commission itself. Under the statute, 47 U.S.C. § 155(d) (3), the Board's decision in this posture has the force and effect of a Commission decision, and is so referred to on occasion throughout this opinion.

2. 19.1% of the population within the normally protected contour of the proposed service would, because of interference, have failed to receive it. This is, of course, nearly double the tolerance provided in the 10% rule. The 10% rule is directed against the inefficient utilization of frequencies, and reflects a judgment by the Commission that the inability of a proposed service to reach as many as 10% or more of the population involved reflects an unacceptable inefficiency in the use of a scarce resource. There are specific exceptions in the rule which reflect other interests, but petitioner admittedly does not fall within them. The Commission, at the time of its issuance, aptly characterized its 10% rule as "the determination of the point at which on an overall basis the resulting interference may become so severe as to outweigh the advantages to be gained by assigning additional stations to the available frequencies." 10 P. & F. Radio Reg. 1595, 1597 (1954). After some years of experience in its administration, the Commission noted the eroding effect of the exceptions and waivers in these terms: "The result has been a developing system of assignments that may be justified in terms of each individual case, but which, on the whole, bears little relation to the rational assignment system represented by the protected contour concept in undiluted form." This last was said in conjunction with the promulgation in 1962 of a partial freeze upon new applications for standard broadcast authority. 23 P. & F. Radio Reg. 1545, 1547. That freeze has no application in this case.

no "white area"; and that, accordingly, the 6,231 persons in question should be added to the 41,182 in the "gray area," resulting in a total of 47,413 for whom the waiver would mean a second service. It thought this circumstance to be petitioner's strongest reason for waiver, but it concluded that it did not overcome the policy considerations giving rise to the 10 per cent rule. Neither did it think that the evidence as to programming was such as to warrant a departure in this case from those considerations. Accordingly, it refused the waiver and denied the application. As noted above, the Commission denied the application to it for review of the Board's action.

## II

■ The dispute over the existence of a "white area" represents clashing interpretations of the Commission's technical rules. We cannot say that the Commission's view of the operation of those rules in this case is clearly in error, particularly in view of the "great weight" which we have heretofore said should be given "in this highly technical field [to] the Commission's construction and application of its own Rules and Standards of Engineering Practice * * *." Interstate Broadcasting Co. v. FCC, 105 U.S. App.D.C. 224, 231, 265 F.2d 598, 605 (1959). Here the situation seems to be that, although the proposed service might provide a stronger signal than presently reaches the business and factory area in question, it would not be a first or primary service and, therefore the geographical area involved would not be

"white" within the contemplation of the Commission's definitions. There appears, then, to have been no misapprehension of fact in this respect distorting the Commission's deliberations on the matter of waiver.

■ The so-called "white area" thus became part of the "gray," and this was recognized as presenting a serious and substantial argument in favor of waiver. But the concept of administrative discretion does not mean that the failure to accept a good argument is invariably an abuse of that discretion. Here it was concluded that that argument, good as it was, when arrayed against the objectives sought to be secured by the 10 per cent rule, was not good enough. Opinions might vary about the correctness of this conclusion, but it is a determination which Congress has primarily committed to an expert agency of its own creation, with a reviewing function in ourselves which is purposefully limited. We observe those limitations when, as here, we leave undisturbed the Commission's resolution of the very kind of problem it was summoned into being to handle.[3]

We turn to the important issue of program content. We are not, we should first make clear, confronted by the Commission with a threshold issue as to the relevance of this matter to the waiver question. That relevance is not here denied. The Commission argues, rather, that the showing made on this point was not such as to vitiate the purposes of the 10 per cent rule and to dictate the granting of a waiver of it. We look to

---

3. Sunshine State Broadcasting Co. v. FCC, 114 U.S.App.D.C. 271, 314 F.2d 276 (1963). Petitioner complains generally that the Commission has granted waivers in cases comparable to this one. In the first place, comparability in this area is an inexact concept at best; and, secondly, the Commission is to be accorded substantial latitude in the continuing administration of a rule such as is here involved, where trial and error is to some extent inevitable. The Supreme Court has said that the Commission is not obliged "to deal with all cases at all times as it has dealt with some that seem comparable." FCC v. WOKO, Inc., 329 U.S. 223, 228, 67 S.Ct. 213, 216, 91 L.Ed. 204 (1946). And this court has referred to the necessarily "pragmatic" nature of the Commission's approach to each requested waiver, see Guinan v. FCC, 111 U.S.App.D.C. 371, 375, 297 F.2d 782, 786 (1961), as well as to the inescapable fact that "the Commission's view of what is best in the public interest may change from time to time." Pinellas Broadcasting Co. v. FCC, 97 U.S.App.D.C. 236, 238, 230 F.2d 204, 206, cert. denied, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956).

the evidence of record in our assessment of petitioner's contention that, on this score at least, the Commission was moved by caprice.

The matter is, as we have said, an important one because the community involved is 40 per cent colored. At the time of the hearing, it was served by four AM stations, two of which operated full time; a TV station; and one FM station. This last became two when petitioner, during the pendency of this proceeding, was awarded authority for a full-time FM station. Although this represents a substantial amount of service for an area of this size, that fact alone would not be very meaningful for 40 per cent of the population if their interests and activities were not appropriately reflected in the programs offered. That the Commission is not oblivious of these considerations and of its capacity to deal directly and effectively with them is attested by its recent action after investigation of explicit charges of discrimination in the programming services offered by eight stations coming up for license renewal.[4]

In proffering evidence of petitioner's assertedly superior performance in this respect, petitioner's counsel expressly disclaimed any "intention to show that there was any discrimination" by the other stations. Although this statement is to be weighed in the light of the local pressures which undoubtedly exist in a situation of this kind, it remains true that the depositions of local citizens put in the record were read by the Commission, and we think rightly, as fully consistent with this disclaimer. Two colored ministers stated that petitioner had volunteered the use of its facilities for their programs; and that no such specific invitation had been forthcoming from the other stations. But they also said that they had never approached the other stations because, as one put it, "We have not sought time on other stations because we were very well satisfied with the service of WJAZ and we didn't think it necessary." Neither of these witnesses nor any other was critical of the services and programming of the other stations, and no charge of discrimination was made. Although a representative of Albany State College, a colored institution, praised petitioner's cooperativeness with it, he referred to WJAZ as "one of the outlets that we used." Although there was unquestionably a basis in the testimony for an inference that WJAZ's programming made more of an effort to reflect the interests and activities of the colored community, there was no evidence placed in the record as to the programs of the other stations.[5]

4. On May 20 last, the Commission announced that, as a result of its inquiry into racial discrimination in the programming of eight Mississippi licensees, it was renewing the licenses of three for only one year and with conditions attached; and that the renewals for the other five were on the basis of warnings, corrective action, and the making of representations as to future conduct. In the case of the one-year renewals, the conditions relate to strict observance of the fairness doctrine, the cessation of discriminatory programming patterns, and the affirmative obligation to seek out the community leaders, including those active in the civil rights movement, and to explore with them the adequacies of the programming in terms of the needs of the whole community. Lamar Life Broadcasting Co., 5 P. & F. RADIO REG. 2d 205 (1965).

5. As an appendix to its brief in this court, petitioner submitted certain documents relating to a complaint made to the Commission, several months after the filing of the petition for review, that WALG, one of the other stations in Albany, had violated the Commission's fairness doctrine. The charge was that WALG had broadcast an editorial critical of the award of the Nobel Prize to the Reverend Martin Luther King, Jr., and had not accorded equal time for reply. The Commission acted to bring this to the attention of WALG and asked for an explanation. WALG replied that it had offered the time, but that it had not understood that it was required to allow the answering matter to be read by someone outside its own staff. The Commission advised that this was not, under its fairness doctrine, a permissible limitation. WALG replied forthwith that it had com-

Thus it seems fair to say that what the evidence did was to establish not that petitioner was the only station serving the colored community but that its record in this regard compared quite favorably with that of the other stations. It does not appear to us that the Commission either regarded this circumstance as irrelevant or ignored it in weighing the matter of waiver. Rather, it seems to have concluded that the objectives of the 10 per cent rule were not overbalanced, and that the pursuit of those objectives should not be relaxed in this instance, there being neither claim nor showing that such relaxation was necessary to assure the Negro groups of at least one outlet for self-expression. We think the record adequately supported this conclusion, and we do not disturb it.

Affirmed.

BAZELON, Chief Judge (concurring):

I concur in the opinion of the court. The Commission's determinations concerning the "white" and "gray" areas are entitled to great weight since they require technical knowledge and expertise which the Commission possesses and we do not.

But on the question of discrimination in program content, the Commission's expertise is at least no greater than ours and no question of regulatory policy is involved in deciding whether or not the facts presented constitute discrimination. Also, we have no difficulty in analyzing the underlying facts as the court's close scrutiny of the record on this issue clearly demonstrates. It follows that our scope of review here is correspondingly wider than it is on the "white" and "gray" area questions. S. E. C. v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); Mitchell v. United States, 313 U.S. 80, 61

plied in full and that, since it now understood that its interpretation of the Commission's fairness doctrine was not correct, it would be "guided accordingly in the future." It was urged to us that

S.Ct. 873, 85 L.Ed. 1201 (1941); Henderson v. United States, 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302 (1950). Nevertheless, the record does not support the claim of discrimination.

this incident demonstrates the need for the waiver of the 10% rule as to petitioner. We are not persuaded, any more than is the Commission, that it must be accorded that significance.