295 F.2d 166
 THE PRICE BROADCASTERS, INC., Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Times and News Publishing Company, The Monocacy Broadcasting Company, Intervenors.
THE MONOCACY BROADCASTING COMPANY, Appellant,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
Times and News Publishing Company, The Price Broadcasters, Inc., Intervenors.
 No. 16039.
 No. 16043.
 United States Court of Appeals District of Columbia Circuit.
 Argued May 17, 1961.
 Decided August 22, 1961.
 Petition for Rehearing En Banc Denied September 21, 1961.
 
 Mr. John B. Kenkel, Washington, D. C., with whom Mr. Arthur H. Schroeder, Washington, D. C., was on the brief, for The Price Broadcasters, Inc., appellant in No. 16039 and intervenor in No. 16043.
 Mr. John P. Southmayd, Washington, D. C., for The Monocacy Broadcasting Co., appellant in No. 16043 and intervenor in No. 16039.
 Mr. Richard M. Zwolinski, Counsel, Federal Communications Commission, with whom Messrs. Max D. Paglin, Gen. Counsel, Federal Communications Commission, Daniel R. Ohlbaum, Asst. Gen. Counsel, Federal Communications Commission, and Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, were on the brief, for appellee. Mr. James T. Brennan, Jr., Counsel, Federal Communications Commission, also entered an appearance for appellee.
 Mr. Robert M. Booth, Jr., Washington, D. C., with whom Mr. John L. Tierney, Washington, D. C., was on the brief, for intervenor Times and News Publishing Co.
 Before DANAHER, BASTIAN and BURGER, Circuit Judges.
 DANAHER, Circuit Judge.
 
 
 1
 The Commission consolidated for hearing three applications for construction permits for standard broadcast stations on the same frequency, 1320 kc. Price sought a construction permit for a station at Frederick, Maryland. Monocacy, already operating WFMD at Frederick, sought a permit to establish a new station to operate unlimited time at Gettysburg, 32 miles away. WGET sought to change its existing Gettysburg facilities from 1450 kc, unlimited time, to 1320 kc, 1 kw daytime and 500 w nighttime. The examiner concluded that the need[1] for a second local station at Frederick exceeded the need either (1) for a second station at Gettysburg or (2) for improving the broadcasting facilities of WGET. He recommended an award to Price even though the two Gettysburg applicants proposed to operate from Gettysburg both day and night, whereas Price, the Frederick applicant, proposed only daytime service.
 
 
 2
 Nevertheless, the Commission after oral argument on exceptions filed by the parties concluded that the intendment of section 307(b) of the Act, 47 U.S.C.A. § 307(b), would better be fulfilled by a grant of either of the fulltime proposals for Gettysburg. The Commission decided that it was more important that even a comparatively small number of persons in the Gettysburg service area receive a primary nighttime service and supplemental daytime service than that a larger number of persons in Frederick receive additional daytime service. We are satisfied that the record establishes an adequate basis for the Commission's conclusion that a fair, efficient and equitable distribution of radio service would be accomplished more certainly than would be the case if the grant had followed Price's Frederick proposal for service daytime only.[2]
 
 
 3
 The Commission then went on to conclude that the Monocacy proposal to bring a second local service to Gettysburg, important though it might be, was of secondary significance since WGET was found to be substantially superior to Monocacy "in virtually every area of standard comparative consideration." Factors so weighed and found in favor of WGET included past broadcast performance, awareness of the needs of the Gettysburg service area, local residence, diversification of business interests and participation in the civil affairs of Gettysburg. The Commission's decision reflected its further determination that WGET would better serve the public interest than would Monocacy, not only because WGET was deemed markedly superior to Monocacy on the basis of past performance and like factors but because WGET with the changed facilities and expanded coverage would continue to provide the only local service to Gettysburg.
 
 
 4
 Specific details predicating the Commission's determination on this aspect may be perceived from certain of its conclusions which we set forth verbatim:
 
 
 5
 "Monocacy would bring a second local service to Gettysburg. Daytime, it would serve virtually 100% of the land area of Adams County, and would serve a total interference-free area of 1,211 sq. mi. having a population of 93,676. In addition to WGET's present operation, Gettysburg presently receives primary service daytime from Stations WBAL, Baltimore, WHVR, Hanover, and WHP, Harrisburg. The whole of Monocacy's 0.5 mv/m area is presently served with such a signal by the foregoing stations, and within this area is presently received a minimum of six and a maximum of twelve other primary services. The 2.0 mv/m contour of Monocacy would encompass the city of Littlestown and would bring that city a fourth such primary service.
 
 
 6
 "Daytime, WGET would serve 96% of the land area of Adams County, and would serve a total interference-free area of 1,233 sq. mi. having a population of 113,470. This would be a gain of 65,224 persons, 14,985 of whom live in the cities of Littlestown, McSherrystown and Hanover, Pennsylvania. Each of the latter two cities presently receives at least five other 2.0 mv/m signals, 50% of Hanover receiving six. Within the WGET gain area there is presently received a minimum of five 0.5 mv/m signals and a maximum of thirteen.
 
 
 7
 * * * * * *
 
 
 8
 "The WGET nighttime interference-free contour would encompass 29.3 sq. mi. having a population of 9,276. Within the foregoing area are 18.3 sq. mi. wherein 1,348 persons presently receive no nighttime primary service from any source. A grant of the WGET application, then, would bring a first nighttime service to all of these areas and persons. On the other side of the coin, however, such a grant would recreate white areas totaling 2.4 sq. mi. having a population of 217. The net white area gains of WGET would thus be 15.9 sq. mi. containing 1,131 persons. The Monocacy nighttime interference-free contour would encompass 23.3 sq. mi. with a population of 8,278. Of these, 7,717 would be receiving only their second nighttime primary service, and 561 would be receiving their first. In view of the considerations set forth here — the white area proposal of WGET and the white and gray area proposals of Monocacy — we believe that there is ample reason for preferring either of the Gettysburg applications to that of the lone application for Frederick."
 
 
 9
 The findings in the examiner's Initial Decision, except as modified in the light of the exceptions, were adopted. Not disturbed was his appraisal that "The manner in which Station WGET has served Gettysburg and Adams County was documented in minute detail," including its "most generous" offers of its facilities to the numerous civic, religious, educational, social and other public service organizations in Gettysburg and Adams County. He found that if WGET is the "successful applicant, its programming will be modified so as to devote more time and attention to the activities in the areas and communities which do not now receive primary service from the station." It is our view that ample basis was shown for the Commission's ultimate conclusion that WGET is entitled to a substantial preference over Monocacy.
 
 
 10
 The Commission concluded that the public interest would better be served by permitting a superior existing station to expand its coverage than by making an award to a new but inferior competitor. Before we could overturn the Commission on this important aspect of the case, we would be bound to say that the Commission's conclusion as a matter of law was arbitrary and capricious.[3] The record simply does not justify our doing so, for exercise of the decisional process in so close a case[4] was singularly within the Commission's prerogative, not ours. That the frequency to be vacated by WGET as a result of the award would thereafter be available for assignment to some other applicant is an important by-product of the Commission's final decision. In sum, the Commission's ultimate judgment is well within the area of its allowable discretion and rests upon appropriate and adequately fortified public interest criteria.
 
 
 11
 We have examined the record and considered carefully the arguments advanced by the competing applicants. We are satisfied that the contested conclusions of the Commission do not lack substantial support in the record as a whole.[5]
 
 
 12
 No error of law having been exhibited to us with respect to the Commission's decision, our review function is at an end. The Commission's decision is
 
 
 13
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 We may take it as undisputed "that the Frederick region has been growing at a substantially faster rate than has the Gettysburg region," as the Commission later noted
 
 
 [2]
 Cf. F. C. C. v. Allentown Broadcasting Co., 1955, 349 U.S. 358, 362, 363, 76 S.Ct. 855, 99 L.Ed. 1147
 
 
 [3]
 Cf. Kentucky Broadcasting Corp. v. Federal Communications Comm., 1949, 84 U.S.App.D.C. 383, 174 F.2d 38
 
 
 [4]
 As the Commission was aware, not unrelated to the problem of assignments in the Frederick area were the issues raised in Richard Lewis, Jr., Inc., (Monocacy Broadcasting Co.) v. F. C. C., 1961, 110 U.S.App.D.C. 269, 292 F.2d 762
 
 
 [5]
 Universal Camera Corp. v. National Labor Relations Bd., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456
 
 
 
 14
 BURGER, Circuit Judge (dissenting).
 
 
 15
 I agree we should not substitute our judgment for that of the Commission on the policy question of whether the nighttime time needs of approximately 500 people in the Gettysburg area outweigh the daytime needs of the larger and growing community of Frederick which has fewer existing services. Radio Cincinnati, Inc., v. F. C. C., 85 U.S.App.D.C. 292, 177 F.2d 92 (1949). Were there no more to the case than that I would concur. But I think we would not exceed our scope of review as an appellate court if we inquired whether the agency had applied the correct standards and considered the proper factors in making its appraisal. Harrell v. F. C. C., 1959, 105 U.S.App. D.C. 352, 267 F.2d 629.
 
 
 16
 In his report and recommendation, the Hearing Examiner noted preferences for the Frederick area not only on the basis of the growing population and service statistics, but also because of the present inadequacies of the single Frederick station, WFMD, to provide adequate service to the area, primarily in the form of a substantially greater amount of time used for commercials than WGET. On the other hand, he found that WGET presently serves Gettysburg needs admirably, without excessive commercialization and with a sufficient number of public service programs. The Commission, however, viewed these findings as mere "icings" and "essentially cumulative in nature." As I read its opinion, it assumed that once a preference for Frederick had been shown on the basis of the population statistics, exploration of these other factors was unnecessary.
 
 
 17
 The difficulty with this view is that it treats a single preference as if it were a factor of uniform and constant measurability like one voter's ballot, or one score in an athletic contest. Thus, once the Commission had awarded a "daytime preference" to Frederick, it proceeded to act as though it need not fully explore the strength of that preference and its relationship to other considerations. As I have earlier stated, if the Commission could be read to have held that regardless of the needs at Frederick for increased daytime service, the nighttime needs of a handful of Gettysburg area residents for first primary service must be given higher preference, I would be reluctant to suggest a contrary view was possibly more correct. But the decision of the Commission indicates rather that it felt there was room for choice, depending on the strength of the need for the two services. In order to make that choice, the Commission was required to evaluate fully the nature of the needs in each location, and it could not neglect such factors as the adequacy of the present service in Frederick in making its determination. Harrell v. F. C. C., supra.
 
 
 18
 Moreover, the Commission did not clearly focus on the nature of the needs in Gettysburg. Its decision states that either of the Gettysburg based applicants is to be preferred over the Frederick based applicant, in order to serve "the Commission's extremely important end of eliminating white and gray areas". But the Commission could not assume that any "gray areas" would be eliminated. This is so because a grant to WGET would not bring a second service to Gettysburg but merely transfer an existing service to another frequency. Thus, the choice reduced itself to the daytime needs of Frederick versus the need for nighttime primary service to approximately 1,131 persons in the Gettysburg area.
 
 
 19
 When the Commission came to its comparative evaluation of the two Gettysburg applicants I suggest it failed to consider one factor which was a critical if not decisive element, namely that WGET would serve 1131 "white area" listeners while Monocacy would serve only 561. In view of the small number of people in the Gettysburg "white area," the slight significance which the Commission attached to white area service in the second phase of the proceedings, and the failure of the Commission to fully evaluate the needs at Frederick, I would not sustain the Commission's decision on these findings.
 
 No. 16043
 
 20
 In determining which of the two applicants for Gettysburg should be awarded the station, the Commission found that the Monocacy proposal for a new station would provide a new service to 28,454 more persons than would a transfer of the WGET station. At night, WGET would reach 570 more persons presently in white areas than would Monocacy. However, Monocacy would provide a second nighttime service to 7717 persons, thus eliminating a gray area to that extent. After reviewing these statistics, the Commission held that "all of the foregoing considerations balance out and that a decisive preference for either applicant does not clearly emerge therefrom."
 
 
 21
 I cannot reconcile the Commission's viewpoint on this issue in this phase of the proceeding with its earlier position discussed above. Recognizing that considerations of efficient use of the frequency were controlling in the decision between Frederick and Gettysburg, but only one of several issues in the comparison between Monocacy and WGET, the Commission's interpretation of the significance of these population statistics does not seem to me to be consistent.
 
 
 22
 Moreover, when the Commission considered the other factors of comparison, it framed the question as if it were faced by a choice of allowing WGET to serve Gettysburg or to allow Monocacy to render the service. But the choice was more accurately between allowing Monocacy and WGET to serve the area or to allow WGET to expand its service. Thus, this fact should have resulted not only in a preference for Monocacy on the criterion of increased competition, but in a recognition throughout the comparison that a grant to Monocacy in no way excluded the continuation of the WGET service.
 
 
 23
 I do not suggest that the Commission was required to grant Monocacy's application merely because it proposed a first choice of local service to Gettysburg. I agree that this factor was but one of the comparative considerations before the Commission, since "otherwise an existing station seeking to improve its coverage by a change in frequency and increase in power would always be barred by a qualified applicant proposing to construct a new station * * *." Valdosta Broadcasting Co., 3 P & F. R.R. 619, 623 (FCC 1948). Nonetheless, in making its comparison, the Commission should consider that the choice is between the grant of a second service and the extension of an existing one with respect to each of the comparative factors to which that fact is relevant. Such a case cannot be approached as if it involved applicants none of whom is presently operating at the proposed location.
 
 
 24
 I would remand to require the Commission to reconsider the issue on the present record and resolve or clarify what seems to me internal inconsistencies in its opinion. I would not preclude reopening the record if the Commission in its discretion considered that desirable.