Herman E. SAYGER, tr/as Sayger Broadcasting Company, Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee.

No. 16956.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 13, 1962.

Decided Dec. 13, 1962.

Mr. Michael H. Bader, Washington, D. C., with whom Mr. Andrew G. Haley, Washington, D. C., was on the brief, for appellant.

Mr. Herman I. Branse, Counsel, Federal Communications Commission, with whom Messrs. Max D. Paglin, General Counsel, and Daniel R. Ohlbaum, Associate General Counsel, Federal Communications Commission, were on the brief, for appellee. Mrs. Ruth V. Reel, Counsel, Federal Communications Commission, also entered an appearance for appellee.

Before BASTIAN, BURGER and WRIGHT, Circuit Judges.

WRIGHT, Circuit Judge.

Alleging that the Commission arbitrarily refused to waive its ten per cent interference rule[1] in denying its applica-

---

1. The Commission's rule, § 3.28(d), 47 C.F.R. § 3.28(d), reads:
"Upon showing that a need exists, a Class II, III or IV station may be assigned to a channel available for such class, even though interference will be received within its normally protected contour; *Provided:* (1) no objectionable interference will be caused by the proposed station to existing stations or that if interference will be caused, the need for the proposed service outweighs the need for the service which will be lost by reason of such interference; and (2) primary service will be provided to the community in which the proposed station is to be locat-

tion for a new full-time standard broadcast station to be located at Tiffin, Ohio, appellant asks reversal of the Commission's order. We find there is substantial evidence in the record viewed as a whole to support the Commission's action.[2]

▉ Whenever two or more radio stations operate simultaneously on the same or closely adjacent frequencies, depending on such factors as distance between and power of the stations, there will be interference in varying degrees. The ten per cent rule represents the Commission's attempt to achieve a proper balance between excessive interference and too restricted use of available frequencies. The rule with reference to daytime stations provides, in effect, that a standard broadcast station may not be assigned to

a channel where the interference from stations assigned to the same or closely adjacent channels will affect more than ten per cent of the population in the proposed station's normally protected primary service area.[3] While in determining the public interest the ten per cent requirement may not be applied mechanically, § 3.28(d) was not intended to be merely a guide, but a "fixed, certain rule" to be waived "only in unusual circumstances in which it is clearly demonstrated that the public interest requires such exceptional action." [4] It has been so applied by the Commission.[5]

▉ Appellant does not challenge the Commission's basic findings.[6] In addition to providing a second local daytime service for Tiffin, appellant's proposal

ed; and (3) *the interference received does not affect more than 10 percent of the population in the proposed station's normally protected primary service area;* however, in the event that the nighttime interference received by a proposed Class II or III station *would exceed this* amount, then an assignment may be made if the proposed station would provide either a standard broadcast nighttime facility to a community not having such a facility or if 25 percent or more of the nighttime primary service area of the proposed station is without primary nighttime service. * * * " (Emphasis added.)

2. 5 U.S.C. § 1009(e) ; Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456 (1951).

3. The circumference of the protected area is a contour line which is fixed by measurement of the strength of the radio ground waves from the particular station.

4. Report and Order of August 4, 1954, In the Matter of Amendment of Section 1 of the Standards of Good Engineering Practice Concerning Standard Broadcast Stations, 10 Pike & Fischer R.R. 1595, 1600 (1954). Compare Beaumont Broadcast. Corp. v. Federal Commun. Com'n, 91 U.S.App.D.C. 111, 115–116, 202 F.2d 306, 310 (1952).

5. The Dodge City Broadcasting Co., Inc., 19 Pike & Fischer R.R. 615 (1960); Huntington-Montauk Broadcasting Co., Inc., 16 id. 173, 175 (1958), rehearing denied, 16 id. 192b (1960) ; Southern Indi-

ana Broadcasters, Inc., 15 id. 349 (1958) ; Reilly and Spates, 14 id. 985 (1958) ; Radio Herkimer, 13 id. 1206d (1956), 111 (1955).

6. The Commission summarized its findings as follows:
"Under its proposed daytime operation, Sayger's normally-protected 0.5 mv/m contour would encompass an area of 2,480 square miles with a population of 211,378 persons. Due to interference from existing stations, 17.5% of the population within the foregoing contour would not receive service from the proposed station. No part of the rural area within the whole of Sayger's normally-protected contour—including the proposed interference areas—receives daytime primary service from fewer than 11 other stations. Tiffin, the city·to be served, receives such service from no fewer than 5 other stations, one of which is located in Tiffin and licensed to Malrite. Other cities proposed to be served by Sayger are presently served by no fewer than 3 other stations. At night, Sayger would be limited to its 13.5 mv/m contour containing 24,001 persons in an area of 117 square miles, the interference within its normally-protected (4.0 mv/m) contour causing a 67.3% population loss. The rural area within Sayger's proposed nighttime service area receives primary service from no fewer than 3 other stations. Tiffin, the only urban area to be served at night, presently receives 2.0 mv/m service from two stations neither of which provides a signal of ˙10 mv/m to Tiffin's business and factory areas."

would give that community its only local nighttime station, including reception for some 2,000 people in the business and industrial area of Tiffin who are presently without a primary radio signal at night. The balance of Tiffin receives primary service from two stations at night and five stations during the day. Appellant's proposed station would provide primary service for a 2,480-square-mile area with a population of 211,378. Other than Tiffin, this area now receives primary service from at least eleven stations by day and three stations by night. Unfortunately, in providing its service, appellant's station would suffer 17.5 per cent daytime interference, while at night

there would be a 67.3 per cent population loss.[7] Since appellant would provide Tiffin with its first local nighttime service, the nighttime interference is not disqualifying under the rule,[8] but the Commission denied appellant's application because its daytime interference was more than ten per cent[9] and there was no showing of the unusual circumstances required for a waiver of this rule.

At the time appellant's application was filed, Tiffin, Ohio, was without a local standard broadcast radio station, although an application to provide such service on a different frequency during the daytime, filed by the Malrite Broadcasting Company, was pending. Appel-

---

7. The explanation for the increased interference at night is detailed in Daytime Skywave Transmissions, 18 Pike & Fischer R.R. 1845, 1847 (1959):

"* * * A second fundamental principle is that involved particularly in the present proceeding—the difference between nighttime and daytime propagation conditions with respect to the standard broadcast frequencies. This is a phenomenon familiar to all radio listeners, resulting from reflection of skywave signals at night from the ionized layer in the upper atmosphere known as the ionosphere. All AM stations radiate both skywave and groundwave signals, at all hours; but during the middle daytime hours these skywave radiations are not reflected in any substantial quantity, and during this portion of the day both skywave service and skywave interference are, in general, negligible. But during nighttime hours the skywave radiations are reflected from the ionosphere, thereby creating the possibility of one station's rendering service, via skywave, at a much greater distance than it can through its groundwave signal, and at the same time vastly complicating the interference problem because of the still greater distance over which these skywave signals may cause interference to the signals of stations on the same and closely adjacent frequencies. Because of the difference between daytime and nighttime propagation conditions, it has been necessary to evolve different allocation structures for daytime and nighttime broadcasting in the AM band, with many more stations operating during the day than at night."

8. See 47 C.F.R. § 3.28(d), quoted supra Note 1.

9. In its decision the Commission discusses its two rulings closest in point:

"* * * But, even if such nighttime features can appropriately be looked to in determining whether a daytime violation should be permitted, the Commission would be reluctant to base a daytime waiver solely or principally on nighttime considerations. Thus, the daytime proposal itself must also possess outstanding features of the type relied upon by the Commission in extending waiver of the Rule.[3] This consideration serves to distinguish the Southern Indiana case,[4] a case principally relied upon by Sayger. There, the daytime station proposed was to be the first in the community as well as the first in the county, and it was also to provide a second primary service daytime to 12,378 persons. Here, Tiffin already has a daytime station, and no portion of Sayger's proposed service area presently receives daytime primary service from fewer than 3 other stations. As in the Dodge City case (footnote 3, supra) the daytime showing is deficient, failing even to approach that before us in Southern Indiana. Accordingly, the waiver request must be denied.

"3 Cf. Dodge City Broadcasting Company, Inc., 29 FCC 900, 19 RR 615 (1960), where the daytime interference was to be 17.7%, and the applicant was to provide a first nighttime service to Liberal, Kansas. Because there was already a daytime station located in Liberal, and because the applicant could show gray-area coverage involving only 747 persons, the waiver request was denied.

"4 Southern Indiana Broadcasters, Inc., 24 CC 521, 15 RR 349 (1958)."

lant unsuccessfully sought consolidation of the hearings on the two applications, asserting that otherwise its application, particularly insofar as it asked for a waiver of the ten per cent rule, would be prejudiced by the prior grant of a construction permit to Malrite. The Commission denied the consolidation and subsequently granted the Malrite application. In denying appellant's application, the Commission adverted to the fact that one local standard broadcast daytime radio station had already been authorized for Tiffin.

■■ Appellant maintains that the Commission erred in denying its motion for a comparative hearing under the Ashbacker [10] doctrine, and compounded this error by using the fact that the Malrite application had been granted as a basis for denying its own. Appellant failed to seek judicial review of the grant to Malrite.[11] Now it seeks collaterally in these proceedings to attack it. This it may not do.[12] Nor can it assert the invalidity of the Commission's action here because of its grant to Malrite. The Commission's action here is tested only by the public interest,[13] free from any inequity that may have devolved upon appellant be-

cause of the Commission's prior action with reference to the Malrite application. As of the time the Commission acted on appellant's application, Tiffin did, in fact, have a local daytime standard broadcast station. And in determining the public interest, the Commission was required to consider that fact in passing on appellant's application.

■ Appellant also argues that the Commission failed to consider its evidence as to the need of a nighttime station in Tiffin. It relies on the Commission's statement in its opinion that such need "can be presumed." But this statement does not necessarily mean that the Commission did not consider the evidence bearing on this necessity. Neither the Commission nor its examiner was required to recite the evidence in their findings.[14] Moreover, the Commission specifically took note of the growing size and importance of Tiffin by granting in substance appellant's Exceptions 1 and 2 [15] to the report of its examiner. Any community which does not have a local station needs one day and night. The Commission simply took note of this obvious fact in presuming that need.[16]

10. Ashbacker Radio Co. v. F. C. C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

11. See, e. g., Ashbacker Radio Co. v. F. C. C., supra Note 10; Mansfield Journal Co. v. Federal Communications Com'n, 84 U.S.App.D.C. 341, 173 F.2d 646 (1949); Pittsburgh Radio Supply House v. Federal C. Commission, 69 App.D.C. 22, 98 F.2d 303 (1938). Cf. United Air Lines v. Civil Aeronautics Board, 97 U.S. App.D.C. 42, 45, 228 F.2d 13, 16 (1955); Northwest Airlines v. Civil Aeronautics Board, 90 U.S.App.D.C. 158, 194 F.2d 339 (1952); Seaboard & Western Airlines v. Civil Aeronautics Bd., 86 U.S. App.D.C. 9, 181 F.2d 777 (1949).

12. Tomah-Mauston Broadcasting Co. v. F. C. C., D.C.Cir., 306 F.2d 811 (1962); Seatrain Lines v. Pennsylvania R. Co., 3 Cir., 207 F.2d 255, 259 (1953).

13. 47 U.S.C. § 307(a).

14. "The Commission was under no obligation to recite every item of evidence, or

of fact, which had some bearing on the questions before it." Mackay Radio & Tel. Co. v. Federal Communications Com'n, 68 App.D.C. 336, 340, 97 F.2d 641, 645 (1938). See also B. & O. R. Co. v. United States, 298 U.S. 349, 359, 56 S.Ct. 797, 80 L.Ed. 1209 (1936).

15. Appellant's exceptions which the Commission granted in substance read:
"1. To the failure to find that Tiffin has substantial size and importance, and has experienced growth in the various economic, industrial and agricultural fields as evidenced by the data contained in Sayger Exhibit 1.
"2. To the failure to find that Tiffin is the center of a large area, and is the location of numerous Federal, state, county and civic governmental bodies, churches, schools, colleges, utilities, industries, civic groups, and other organizations."

16. Cf. The Price Broadcasters, Inc. v. F. C. C., 111 U.S.App.D.C. 179, 295 F.2d 166 (1961); Radio Cincinnati v. Federal Communications Com'n, 85 U.S.App. D.C. 292, 295, 177 F.2d 92, 95 (1949).

The delicate balance in the public interest to be achieved by the assignment of radio frequencies is a matter committed to the expertise of the Commission. This record shows no arbitrary or capricious action, or violation of procedural safeguards, on the part of the Commission in complying with its obligation under the Act.

Affirmed.