**DEEP SOUTH BROADCASTING COM-
PANY, Appellant,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,**

Triple C Broadcasting Corporation,
Intervenor.

No. 18507.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 5, 1964.

Decided April 1, 1965.

Danaher, Circuit Judge, dissented.

Mr. Eugene F. Mullin, Jr., Washington, D. C., for appellant.

Messrs. J. Parker Connor and S. White Rhyne, Jr., Washington, D. C., also entered appearances for appellant.

Mr. Michael Finkelstein, Counsel, F. C. C., with whom Messrs. Henry Geller, Gen. Counsel, and Daniel R. Ohlbaum, Associate Gen. Counsel, F. C. C., were on the brief, for appellee.

Mr. Carl H. Imlay, Washington, D. C., with whom Messrs. Philip G. Loucks and Maurice M. Jansky, Washington, D. C., were on the brief, for intervenor.

Before DANAHER, BURGER and McGOW-AN, Circuit Judges.

McGOWAN, Circuit Judge:

This statutory review proceeding relates to the grant by the Federal Communications Commission of an application by Radio Station WKTG, of Thomasville, Georgia, to increase its authorized power. The objector to this action, and the petitioner here, is Deep South Broadcasting Company, which operates Radio Station WBAM in Montgomery, Alabama. Asserting undue interference with its own operations by reason of the increased power, Deep South pressed its opposition to WKTG's application actively throughout the proceedings. It urges upon this appeal both a substantive and a procedural error as justifying corrective action by this court. We are not impelled by the former claim alone to intervene, inasmuch as it falls within the area of customary deference by us to the Commission's judgments so long as they are supported by substantial evidence of record. But the Commission seems in this instance to have indulged itself in a procedural short-cut which we think has given Deep South a legitimate basis to complain of the manner in which the substantive determination was made. It is for this reason that we remand the case to the Commission for further proceedings.

I

When WKTG's application was filed, it was manifest to all parties that it could not succeed without a waiver by the Commission of its so-called "10% Rule." 47 C.F.R. § 73.28(d) (3). The effect of this rule here was that WKTG's proposed operation was not to be approved if the interference to be received by it affected more than 10% of the population in its normally protected primary service area. In its application, WKTG requested a waiver of the rule, and advanced reasons in support of that request, consisting of assertion that, first, the new operation by WKTG would be a violation of the "10% Rule" in lesser degree than that in which it was currently involved; and, second, the increased power would enable WKTG to serve its existing area better as well as to provide new service to additional areas. It did not allege that the increased power would be without adverse effect on the use of the frequency spectrum elsewhere.

The Commission issued an order designating the application for hearing on certain specified issues raised by the allegations in the application, and making Deep South a party because of the interference by the new operation with WBAM. A one-day hearing was held at which the sole witness for WKTG was a professional engineer who sponsored an exhibit containing material relevant to the issues specified in the Commission's hearing order. He was cross-examined by Deep South, resulting in certain corrections by him of his exhibit and testimony. By agreement of the parties, proposed findings of fact and conclusions of law were first submitted by the Commission's Broadcast Bureau. Addressing itself to the issues canvassed in the hearing, it recommended that the application be granted. It made no reference to the question of the effect of the grant upon the use of the frequency spectrum elsewhere.

The Hearing Examiner's findings were somewhat different from those submitted by the Broadcast Bureau, reflecting certain alternative findings proposed by Deep South in the light of the developments at the hearing. He did, however, recommend the granting of the applica-

tion, although he expressly noted that he might well have gone either way on the record beore him. As he put it, "this case is a close one and the judicial officer is hard put to make a decision." Deep South's appeal from this decision was, under the Commission's rules, heard by the Review Board. During oral argument before it, the matter of the frequency spectrum was raised for the first time by an inquiry from a member of the Board, directed to counsel for WKTG, if the record showed "whether or not a grant of this application would be of any impact upon the future assignment to other stations?" Counsel replied that

there was no such showing, and that "that issue is not presented here in any respect whatsoever." Counsel for Deep South, in his rebuttal argument, made reference to this exchange, and observed that "it was up to the applicant [WKTG] to make such a showing if such a showing could have been made."

The Review Board upheld the grant of the application. In Paragraphs 5–7 of its Decision, however, the Review Board addressed itself expressly to the issue of the frequency spctrum. As appears from these paragraphs, set forth in the margin,[1] the Board, in default of any

1. "5. Thomas County Broadcasting Company, Inc. made no showing concerning the effect the grant of its application might have upon the efficient use elsewhere of 730 kc, and frequencies adjacent thereto. The Board is of the view that such a showing would have been desirable in connection with its request for a waiver of Section 3.28(d) (3) of the Commission's Rules, such a showing being an additional factor to be considered in its request for a waiver of the rule. (See Suburban Broadcasting Co., Inc. (WVIP), 31 FCC 16, 20 RR 375 (1961).) However, in view of the particular frequencies involved here, the nature of the evidence already in the record, i.e., applicant's Exhibit 1, Figure 8, and the provisions of the Commission's Rules in regard to classifications and assignments of the adjacent channel frequencies here pertinent, an evaluation of the impact can be readily made.

"6. First, the aforementioned exhibit shows that existing 0.025 mv/m contours on 730 kc already overlap all areas into which the proposed WKTG 0.025 mv/m contour would be propagated except to the west and north. Because of this fact, assignments on 730 kc in such areas would be subject to interference from existing stations. To the west of Thomasville is located Station WBAM at Montgomery, Alabama, operating on 740 kc. Such operation precludes the use of 730 kc in that direction, as well as to the northwest. To the north, the 0.5 mv/m contour of WSB, Atlanta, Georgia (Class I–A, 50 kw, U, 750 kc) falls inside WKTG's existing 0.025 mv/m contour. Thus, an assignment in this direction outside of this contour would lie within the WSB 0.5 mv/m contour, and would result in interference to WSB, deter-

mined in accordance with the Commission's Rules (See Section 3.182(q) and (w)). However, there is an area to the northeast between the existing and proposed WKTG 0.025 mv/m contours in which there is no other existing co-channel 0.025 mv/m contour and which is also outside the WSB 0.5 mv/m contour. In this area, a station on 730 kc, if its service area were limited thereto, could be assigned and would provide primary service in accordance with the rules without causing interference to, or receiving interference from existing stations. This area is approximately 150 miles from Thomasville and is about 45 miles in depth. The width of the area is relatively small, it being approximately twenty miles at its narrowest point.[4] How-

"4. The boundaries of this area have been established by extending the 0.5 mv/m contour of WSB and the 0.025 mv/m contour of WPAL, shown on Exhibit 1, Figure 8 into the area concerned by employing the methods set out in the Commission's Rules.

ever, because of its smallness, any station assigned in it and meeting the power requirements of the rules, would be subject to interference from existing station,[5] since the 0.025 mv/m contour of

"5. The minimum power which will be authorized for Class II stations is 250 watts. (See Section 3.21 of the Commission's Rules.) Using an antenna efficiency of 88.5 mv/m, and a conductivity of 4 millimhos per meter, as shown on Figure 8 of Exhibit 1, the 0.5 mv/m contour of a 250 watt station would extend to 32 miles.

an existing station would overlap the 0.5 mv/m contour of such station. Thus, in view of the foregoing, it appears that the WKTG proposed 0.025 mv/m contour

showing by the applicant, thought the issue so relevant to the informed exercise of judgment on the requested waiver that it proceeded to make factual determinations with respect to it. These appear to have rested, insofar as evidence of record was concerned, upon information contained in WKTG's exhibit referred to above. Later in its Decision the Board said:

"12. As shown by our findings in paragraphs 5–7, the Review Board has made an independent evaluation of the impact that a grant of WKTG's application might have upon future assignments of stations on the frequencies pertinent to such consideration. We believe that they substantively reflect the degree to which a grant of WKTG's application would affect the possible use of other frequencies. Any party shall on timely request be afforded an opportunity to show the contrary. We, therefore, do not think it necessary at this time to reopen the record in order to obtain additional evidence on this matter. (See Triangle Publications, Inc. (WNHC–TV), 29 FCC 315, 17 RR 624 (1960), affirmed *sub. nom.* Triangle Publications, Inc. v.

F. C. C., [110 U.S.App.D.C. 214,] 291 F.2d 342, 21 RR 2039 (1961).)"

Deep South sought review by the full Commission. In addition to protesting the Board's decision on its merits, it claimed, in respect of the frequency spectrum issue, a transgression of the fair procedure contemplated by the Communications Act and the Administrative Procedure Act. It made this second claim the basis of an alternatively requested remand for further hearing. Its position with respect to the relief to which it believed itself entitled was set forth as follows in its application for review:

"Respondent submits that the Commission can, and should, deny the WKTG application on the basis of the record, without further hearing. Respondent further submits, however, that the Commission ought not, under any circumstances, to affirm the Review Board's Decision without further hearing. If the Commission is of the view that the subject matter of Paragraphs 5–7 and 12 of the Decision should be inquired into on the record, it is respectfully requested to remand the proceeding to a Hearing Examiner,

would not be propagated into areas where an assignment on 730 kc could now be made without either causing interference to, or receiving interference from existing stations.

"7. With respect to other frequencies, it is apparent from Exhibit 1, Figure 8, that the increase in power of WKTG would not affect the use of 740 kc elsewhere since any assignment in the area to be gained by WKTG is already precluded by the existing operation of WBAM at Montgomery, Alabama.[6] Other frequencies here pertinent for consideration are 700 kc, 710 kc, 720 kc, 750 kc and 760 kc. Of these, 700 kc, 720 kc, 750 kc and 760 kc are not available for use in this area pursuant to the rules. (See Section 3.25 of the Commission's Rules.) The remaining frequency is

"6. A projection of WBAM's 0.025 mv/m contour in accordance with the provisions of the Commission's Rules shows that it falls approximately 70 miles beyond WKTG's proposed 0.5 mv/m contour.

710 kc; it is 20 kc removed from WKTG's operating frequency (730 kc). To be in compliance with the rules, an assignment on 710 kc in this area would have to be located so as to avoid interference to WKTG's existing operation on 730 kc in Thomasville, and also to avoid an overlap of the 25 mv/m contour of either the 710 kc operation or the 730 kc operation with the other's 2 mv/m contour. (See Sections 3.37 and 3.182(q) and (w) of the Commission's Rules.) It should also be noted that 710 kc is already precluded from use in substantial areas around Thomasville by the existing operation of WKTG. Its use would be somewhat further restricted by the proposed operation. Such restriction would be to the same extent that WKTG's service area is extended, a maximum of approximately twenty miles beyond WKTG's existing service area.[7]

"7. This finding is exclusive of any effect which other existing 710 kc stations might have upon a 710 kc assignment in this area."

with provision for review of the Examiner's Initial Decision directly by the Commission."

The Commission's order denying review of the Review Board's decision, as well as that decision itself, are brought here by Deep South's appeal.

## II

■ In the view we take of the case, we need not look beyond the Communications Act, 48 Stat. 1064 (1934), as amended, 47 U.S.C. § 151 *et seq.*, in order to conclude that Deep South received something less than the kind of hearing that statute requires. WKTG had, under the Act, applied for privilege conferrable by the Commission. Section 309(e) provides that any hearing held upon such an application "shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate"; and both the burden of proof and the burden of going forward with the evidence are placed in terms upon the applicant. We have no issue of fact here as to whether the Review Board did, after the closing of the record, raise a new issue and resolve it by reference to facts only partially reflected in the record. The Board itself has said as much.[2] Neither are we troubled by any serious contention that this mode of proceeding falls within the scope of what is normally contemplated by Section 309(e) as a full and fair hearing. The question we do face is that of whether, as now argued to us by the Commission, Deep South has either not been prejudiced in any significant way by what the Board did in this instance, or is foreclosed by its asserted failure to respond affirmatively to the Board's invitation to attack its findings on frequency allocation.

■ The first branch of this inquiry involves two preliminary questions: Could the newly-raised issue have played a significant role in the Board's ruling on the merits of the application; and, if so, can it be safely assumed that the raising of the issue earlier would have made no difference in respect of the evidence adduced, the factual findings made, and the conclusions drawn from them? With respect to the former, we need not tarry long. The Hearing Examiner, before whom this issue was not raised, said he found the case so close that he could have decided it either way. The Review Board thought the issue so pertinent that it raised it for the first time, admittedly went outside the record in its consideration of it, and in its Decision characterized it explicitly as a factor to be considered in weighing the merits, after which it devoted a significant part of its opinion to the findings and conclusions it made in the course of its "independent evaluation" of the matter. The Board's offer to afford any party an opportunity to dispute its determination in this regard speaks eloquently of the Board's consciousness of the degree to which its belated throwing of this weight upon the scale inclined the balance. In its recognition of the relevance of this factor the Board was, moreover, merely following clear Commission policy, which had theretofore comprehended the effect upon the future use of the frequency spectrum within the standards to be followed in assessing waiver of the "10% Rule." See Suburban Broadcasting Co., 31 F.C.C. 16 (1961), and Old Belt Broadcasting Corp., 30

2. In addition to what has been set forth above as appearing from the face of the Board's Decision, it is of interest to note that the Board, in another case some four months later, characterized what it did in the case before us in these terms: "A proper study was made by the Board in the Thomas County Broadcasting Co. [WKTG] case * * * because there a study could readily be made with *little* reference to evidence outside the record * * *." (Emphasis supplied.) Salem Broadcasting Co., 2 R.R. 2d 64, at 68 (1964). As in other areas of human experience, reliance upon a "little" departure from the norm is a treacherous refuge from reality. And, with the best will in the world, the accuracy of the adjective in these circumstances also depends a lot on who is using it.

F.C.C. 1067 (1961). We are certainly in no position to say that this factor did not provide the further gleam of light which the Hearing Examiner implied he needed in order to be confident that reason, rather than chance, steered the course.

■ Nor can we share the Commission's assurance that nothing that Deep South could have done in a hearing, meeting evidence brought forward by the applicant, would have altered the result reached by the Board. As to the evidence used by the Board which was in the record (i. e., the exhibit submitted by WKTG), the hearing itself had been a demonstration of what adversary scrutiny and cross-examination can accomplish in the way of altering the probative force of evidence. As to the evidence outside the record, we are less sure of what it was than of the fact of reference to it. We think it unseemly for appellate courts to try to inform themselves as to the nature of off-the-record evidence so that they may have some basis of appraising the extent to which a party might have nullified it by evidence of his own or qualified it by cross-examination. The hearing room is the proper place to test these specula-tions, or else they will always remain just that.

■ We turn, then, to the remaining question of whether the impact upon Deep South of the Board's procedural unorthodoxy was sufficiently ameliorated by the Board's statement of its willingness to hear any challenge to the accuracy of the results of its "independent evaluation." It is said that Deep South should not now be heard to complain because it did not ask the Board to reopen the hearings at that time. But Deep South was not an applicant for a licensing privilege, nor was there any burden of proof on it to establish that WKTG's application should be denied. It was entitled to lay before the Commission, as it did, its alternative contentions that WKTG had not sustained its burden of proof as to the merits of its application, and that the application should be denied; or that the procedure followed in assembling the quantum of proof on behalf of the application had been so irregular that, if the Commission was not disposed to deny the application without more, it should remand the application to a Hearing Examiner so that WKTG could seek to sustain *its* burden of proof on the record.

This was a course we think Deep South was justified in pursuing.[3] It could not

---

3. The Board, by citing Triangle Publications, Inc. v. F. C. C., 110 U.S.App.D.C. 214, 291 F.2d 342 (1961), at the end of Paragraph 12 of its decision, see page 462 *supra*, apparently found warrant for what it did in that precedent. In *Triangle*, the Commission had calculated the number of persons who would experience a loss of service if the applicant's request for permission to move its transmitter were granted, using evidence contained in exhibits already in the record and population maps prepared by the United States Census Bureau. It denied the application, though what significance it attributed to the results of its calculation does not appear. We found no reason to disapprove the Commission's use of the information "in the absence of any challenge to the accuracy of the method used," particularly where the Commission's failure to consider certain service gains, which appeared to be the real object of the appellant's complaint, did "not bear sufficiently upon the heart of the matter." 110 U.S.App.D.C. at 216–217, 291 F.2d at 344–345.

But this case is not controlling here. The Commission's foray outside the record in *Triangle*, if such it was, did not have the effect of shifting the burden of proof on a controlling issue from the applicant, on whom it is placed by statute, to the intervenor, who theoretically begins with no burden at all. Nor did it interject a new issue into the proceeding after the time for the introduction of evidence had passed and after the parties had been lulled into believing it was not in the case. There is not the slightest indication that Triangle Publications was given reason to think that the loss-of-service issue was out of the case. And finally, as we noted, Triangle did not contest the accuracy of the Commission's computations. By contrast, in oral argument before us and in its brief, Deep South represented that the very reason

know exactly how, or upon what, the Review Board had arrived at its findings and conclusions with respect to frequency allocation; and, in any event, it had no burden of proof of any kind on this issue, either affirmative or negative. It was entitled to see what evidence WKTG could or would bring forward on that issue, and to test it by cross-examination or to counter it by evidence of its own. This is not capable of accomplishment by oral argument before the Review Board or the filing of briefs with it. This is for the adversary hearing with which Section 309(e) is concerned, and the remand we make hereby is for the purpose of enabling the requirements of that statute to be observed.[4]

It is so ordered.

DANAHER, Circuit Judge (dissenting).

The intervenor sought ˪ increase from 1 kw to 5 kw the power of its standard broadcast station WKTG which operates on a frequency of 730 kc at Thomasville, Georgia. The Commission designated the application for hearing prescribing issues calling for a determination of (1) the areas and population to be served by the proposed increase in power; (2) the interference which the proposed operation would receive from, and cause to, other stations; and (3) whether circumstances justified a waiver of the Commission's 10 per cent rule. The appellant operating its station WBAM on adjacent channel 740 kc at Montgomery, Alabama, opposed the application. The Hearing Examiner found that a waiver of the 10 per cent provision of the Commission's Rules was warranted.

The Commission's Review Board considered the appellant's exceptions, and after oral argument affirmed the Examiner's Initial Decision. The Review Board noted that such interference as involved the appellant would occur about 130 miles southeast of Montgomery, Alabama, in an area which lies entirely in the state of Georgia. At least six, and possibly eleven stations now serve some part of that interference area. On the other hand, WKTG would be improving its facilities to the maximum permitted by the Commission's Rules with respect to the use of its Class II frequency. Moreover, WKTG would extend its service to an additional area of some 2,800 square miles and to about 100,000 persons. Deeming the interference to WBAM to be insignificant, particularly in contrast to the advantages to the public interest which would be served by the grant of additional power, the Review Board concluded that the WKTG application should be granted. The Commission denied the appellant's application for review of the Review Board's Decision.

*Without more,* we would be bound to affirm, for the findings in the foregoing respects have not been shown to be clearly erroneous. They fully support the action taken by the Commission. I believe my colleagues would so agree.

But I think my colleagues are now saying, in effect, that the intervenor after meeting the issues as designated by the Commission, must nevertheless go farther and demonstrate that no other obstacle to waiver may exist. The point of departure between us stems from the fact that the Review Board noted in its opinion that it had gone beyond the issues as explored before the Hearing Examiner. Neither

it wants the hearing reopened is for the purpose of subjecting WKTG's raw statistics and the Review Board's interpretation of them to the scrutiny of cross-examination.

Sayger v. F. C. C., 114 U.S.App.D.C. 112, 312 F.2d 352 (1962), urged upon us by the Commission in brief and oral argument, dealt only with a contention that the Commission had "presumed" one of the facts in issue without taking into

account evidence presented by the applicant.

4. Deep South has asked that we in effect disqualify the Review Board from any further role in this case, but the question of its future participation is one we leave to the sound discretion of the Commission in the light of its knowledge of the constitution of the Board and its manner of functioning.

WBAM nor WKTG had offered evidence as to what bearing the increase in power might have on Mexico's priority of use of 730 kc as a Class I-A channel. Mexico's right stemmed from an agreement between that country and the United States, with a reservation to the latter that the Commission might assign Class II daytime stations, such as WKTG, on the 730 kc frequency with a maximum power of 5 kw.[1] Although neither of the parties had considered that factor, the Board satisfied itself that the Mexican treaty created no bar to the grant of the pending application. Also, the Board examined into what effect the grant of the WKTG application might have upon *future* assignments of stations on other frequencies, although neither WBAM nor WKTG had offered evidence as to this possibility before the Examiner.

Obviously, inquiries into such phases come within the competence of the expert Board as it executes its duty to consider all aspects of a problem committed to it. The personnel of the Review Board must "be qualified, by reason of their training, experience, and competence, to perform * * * review functions * * *."[2] It is responsible solely to the Commission. "Neither the Commission nor any of its members will discuss the merits of any matter pending before the Board with the Board or any of its members."[3] So, it was the task of the independent Board here to consider the Examiner's findings and the record before it. It ascertained grounds upon which a waiver of section 3.28(d) of the Commission's Rules might rest and that was sufficient. Its additional study simply demonstrated that there was no *other*

bar to the waiver. The intervenor had amply borne its burden of proof as to the issues as designated by the Commission.

The Board merely drew upon its expertise and upon the record before it in observing: "Furthermore, as an additional factor," that the grant would not adversely affect "future assignments of stations on the frequencies pertinent to such consideration." The Board so stated after independent evaluation of the data, the exhibits and the Commission's Rules with reference to the facts so readily discernible. The Board might just as well have said: "We have also considered the impact the pending grant might have upon frequencies which have been reserved for military use,[4] and find no adverse results will follow." In like manner the Board well may have considered yet other "factors" of which it made no mention in its decision. Not only was the Board an expert body with definite duties with respect to the record it was considering, it was bound, no matter what the parties did or said, to apply the public interest touchstone. It might even have decided unless its action were arbitrary that the application should be denied. Here, however, the Board drew its projections and calculations from the available engineering and technical data shown on the record before it.

If WBAM had claimed that the agency action had rested upon official notice of facts not appearing of record, the appellant on timely request would have been entitled to an opportunity to show[5] that the result was lacking in appropriate support. No such request was made.

---

1. Interestingly enough, appellant makes no challenge to the Board's finding that the 730 kc frequency was thus available although the Board's conclusion is clearly based upon its expertise as related to the record here.

2. 47 U.S.C. § 155(d) (8) (Supp. V, 1964).

3. 47 C.F.R. § 0.361(e) (1964); and see 47 C.F.R. § 0.365 (1964) as to the Board's authority.

4. Cf. Bendix Aviation Corp., Bendix Radio Div. v. F. C. C., 106 U.S.App.D.C. 304, 272 F.2d 533 (1959), cert. denied Aeronautical Radio, Inc. v. United States, 361 U.S. 965, 80 S.Ct. 593, 4 L.Ed.2d 545 (1960).

5. See 5 U.S.C. § 1006(d) (1958).

Undoubtedly the reason appellant submitted no such request was that the Board composed of experts said

"in view of the particular frequencies involved here, the nature of the evidence already in the record, i. e., applicant's Exhibit 1, Figure 8; and the provisions of the Commission's Rules in regard to classifications and assignments of the adjacent channel frequencies here pertinent, an evaluation of the impact can be readily made."

Of course, I agree with my colleagues that WKTG had the burden of establishing that a waiver of the 10 per cent rule was as appropriate in the use of 5 kw power as had already been found in its use of 1 kw power. The difference in interference, as it turned out, was negligible. WKTG had already fully sustained its waiver burden as the Examiner found and as the Board agreed. That could and should have ended this case so far as there had been an issue simply *as between* WKTG and WBAM.

At the risk of certain redundancy, let me reemphasize the Board's explanation that it took upon itself the consideration of other factors. The Board knew very well that it is the Commission's duty not only to supervise radio traffic but to determine the composition of that traffic,[6] even to an ascertainment of whether or not the requested action was technically feasible. In behalf of the Commission the Board initiated its own public inter-

est inquiry. It acted in light of the engineering data and the exhibit already of record as correlated with the Commission's Rules. The Board in light of its own analysis could discern that the proposed increase in power would be without adverse effect on the use of the frequency elsewhere. Such was the basis upon which it applied its expertise, quite equal to measurement of the effect of the waiver upon other frequencies, 700 kc, 710 kc, 720 kc, 750 kc and 760 kc. Four of those frequencies simply were not available for use in the affected area under the Rules, the Board stated. Should WKTG have to prove that? If the Board had stated only that the Mexican treaty created no barrier to a waiver, surely my colleagues would with equal logic insist that WKTG must now prove out that result as well. I hope my position is clear: the result as seen by the Board was just as obvious as that north latitude 38° 53′ 51″ and west longitude 77° 0′ 33″ spells "Washington, D. C." to an airlines pilot or the C.A.B.

My colleagues are saying, in effect, that this applicant for a waiver on clear channel frequency 730 kc must show that use of that frequency will not cause non-waiverable difficulty to someone else, somewhere else, at some future time. I do not agree.[7]

I submit that the Board's action and the Commission's orders were clearly right. This case should not be remanded to an overburdened Commission. I would affirm.

6. Interstate Broadcasting Company v. F. C. C., 105 U.S.App.D.C. 224, 265 F.2d 598 (1959).

7. Even if Deep South had *never* participated in this case, it would have been the Commission's duty to ascertain the public interest in light of the data before it. See 47 U.S.C. §§ 308, 309 (Supp. V, 1964).