COLUMBIA BROADCASTING SYSTEM, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents,

Democratic National Committee and Republican National Committee, Intervenors.

DEMOCRATIC NATIONAL COM-MITTEE, Petitioner,

v.

FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents,

Republican National Committee, Intervenor.

Nos. 24655, 24659.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 24, 1971.

Decided Nov. 15, 1971.

Tamm, Circuit Judge, filed concurring opinion.

Mr. Timothy B. Dyk, Washington, D. C., for petitioners. Messrs. J. Roger Wollenberg, Ezekiel G. Stoddard, Daniel Marcus and Frank W. Lloyd, III, Washington, D. C., were on the brief for petitioners in No. 24,655.

Mr. Daniel R. Ohlbaum, Deputy Gen. Counsel, Federal Communications Commission, for respondents.

Messrs. Richard E. Wiley, Gen. Counsel, Federal Communications Commission, John H. Conlin, Associate Gen. Counsel, Federal Communications Commission, at the time the brief was filed, and Stuart F. Feldstein, Counsel, Federal Communications Commission, were on the brief for respondents.

Mr. W. Theodore Pierson, Washington, D. C., with whom Mr. James J. Freeman, Washington, D. C., was on the

brief, for intervenor Republican National Committee.

Messrs. Joseph A. Califano, Jr., David H. Lloyd and Irvin Nathan, Washington, D. C., were on the brief for petitioner in No. 24,659 and intervenor Democratic National Committee in No. 24,655.

Before WRIGHT, TAMM and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The question on these appeals is whether the Federal Communications Commission abused its discretion in holding that a 25-minute program broadcast by the Democratic National Committee, setting forth views on public issues in response to views previously presented by the President and presidential spokesmen in a number of broadcast appearances, gave rise to an obligation on the part of the Columbia Broadcasting System to provide comparable reply time to partisan Republican spokesmen. For reasons that follow, we reverse the Commission's order.

I

Television has become, in recent years, a principal vehicle by which the President presents to the public his views on important issues of the day. Indeed, no single fact of our changing political life overrides the significance of the expansion of the President's ability to obtain immediate and direct access to the people through the communications media. For the words of the President, speaking as he does both in his constitutional roles of chief executive and commander-in-chief and in his extra-constitutional role as head of his party, carry an authority, a prestige and a visibility that have a counterpart in no other institution.

Moreover, there is an inherent newsworthiness in anything the President says. In addition to his huge direct audiences, in most cases over all nationwide commercial television and radio networks simultaneously, all of what he says is later reported somewhere and something of what he says is reported almost everywhere. In the case of the incumbent administration, these built-in advantages of the presidency in forging public opinion have been used to an unprecedented degree. In his first 18 months in office, President Nixon appeared on network prime time (7:00 to 11:00 P.M.) television as often as Presidents Eisenhower, Kennedy and Johnson combined in a comparable period during their administrations.[1]

The President's extensive use of the media cannot, of course, be faulted, for there can be no doubt that in the distillation of an informed public opinion such appearances play a very basic role. But if the words and views of the President become a monolithic force, if they constitute not just the most powerful voice in the land but the only voice, then the delicate mechanism through which an enlightened public opinion is distilled, far from being strengthened, is thrown dangerously off balance. Public opinion becomes not informed and enlightened, but instructed and dominated.

To minimize the risks of such imbalance and to preserve the essential integrity of "politics through communication," the television networks, under the occasional prodding of the courts and the Federal Communications Commission, have attempted to achieve a balanced presentation of opposing opinions. This balancing process has extended not only to regularly scheduled news broadcasts, specials and documentaries, but also to

1. In their first 18 months in office, President Eisenhower appeared on prime time network television on 3 occasions, President Kennedy 4 times, President Johnson made 7 such appearances, and President Nixon 14. These figures exclude appearances on regularly scheduled news broadcasts, reports on foreign trips, charity appeals, convention and campaign appear-

ances in the case of President Johnson, and, in that of President Nixon, his Apollo appearances. Remarks by Frank Stanton, President, Columbia Broadcasting System, Park City, Utah, July 10, 1970, A. 49, 50. ("A. ——" references are to the Appendix of materials from the record before the Commission.)

provision of free time to leaders of the principal opposition party to respond to prior presidential appearances.[2]

In this spirit, on June 22, 1970 CBS offered Lawrence O'Brien, Chairman of the Democratic National Committee (DNC), 25 minutes of broadcast time for presentation of views of the Democratic Party on public issues. The offer was made in light of the "cumulative impact of broadcast appearances of representatives of the party in office" and "the disparity between presidential appearances and the opportunities available to the principal opposition party" in order to achieve "fairness and balance in the treatment of public issues." [3] The format and content of the "Loyal Opposition" broadcast were left to Mr. O'Brien to fashion in conformity with the stated purpose of the offer. CBS did not dictate which of the particular issues discussed by the President were to be covered, the allocation of time to be made among such issues, or the spokesman to be used.

Mr. O'Brien accepted the CBS offer and the broadcast was aired on July 7, 1970. The format employed involved presentation of excerpts of previously broadcast presidential statements on various issues, followed by a critical commentary or rebuttal by Mr. O'Brien as to each presidential statement.[4] Topics covered included: (1) the state of the economy; (2) the nation's crime problem; (3) civil rights for blacks and other minorities; (4) federal expenditures for defense *versus* public domestic issues; (5) air and water pollution; (6) dissent and national unity; and (7) the war in Indochina.[5]

On July 8, 1970, the chairman of the Republican National Committee (RNC) requested CBS to provide free time to RNC comparable to that afforded for the July 7 broadcast.[6] Shortly thereafter, having received no reply,[7] RNC filed a petition with the Commission requesting that "the Commission * * * make its views known to CBS that their failure to afford forthwith" an opportunity to RNC to reply to the July 7 broadcast "would constitute a violation of the Fairness Doctrine and CBS's obligations as a licensee of broadcast stations." [8]

In substance, RNC argued that a national committee such as DNC was an inappropriate spokesman "to discuss specific political, economic and social issues—the 'gut issues.' " [9] RNC alleged that the result was "a political attack on the President and his party," rather than an "issue-oriented response." Finally,

2. For example, during both Democratic and Republican administrations CBS has made time available, following the President's State of the Union address, to congressional leaders of the opposition. *See* CBS Response to Republican National Committee Petition, A. 32, 38.

3. Telegram from Frank Stanton, President of CBS, to Lawrence O'Brien, June 22, 1970, A. 20–21.

4. The presidential statements were drawn from his Inaugural and State of the Union addresses, news conferences, and special addresses on such matters as the Cambodian invasion and the veto of the Health, Education and Welfare appropriations bill. Mr. O'Brien used Mr. Nixon's nomination acceptance speech to illustrate his views on the crime problem, and a broadcast statement by Vice President Agnew to supplement a statement by President Nixon on the question of

dissent and national unity. *See* transcript of the O'Brien broadcast, A. 23–31.

5. Following the O'Brien broadcast, there were several minutes of analysis by members of the CBS news staff of the type that customarily follows presidential appearances. In addition, a few CBS-affiliated stations, including the 5 CBS-owned television stations (but not the CBS television network), carried a paid political fund raising announcement purchased by DNC directly from the stations.

6. Letter from Rogers C. B. Morton, Chairman of RNC, to Mr. Stanton, President of CBS, July 8, 1970, A. 17–19.

7. A reply was sent on July 15, 1970, 2 days after RNC filed its petition with the Commission, denying reply time to RNC. CBS letter to Mr. Morton, Chairman of RNC, July 15, 1970, A. 45.

8. A. 11.

9. A. 5.

RNC asserted that the O'Brien broadcast had injected a "fresh issue not specifically treated by any Presidential speech: *which political party should hold power.*"[10] RNC concluded, therefore, that Mr. O'Brien's treatment of this "which party" issue gave rise to a duty on the part of CBS, under the Commission's fairness doctrine, to afford time for RNC to present the other side of the issue.[11]

On July 23, 1970, CBS submitted a letter in opposition,[12] and a week later RNC filed its reply.[13] Then, on August 18, 1970, the Commission released its memorandum opinion and order[14] disposing of five fairness doctrine complaints, including that of RNC.[15] In granting the relief requested, the Commission specifically rejected RNC's argument that national committees are inappropriate spokesmen to respond to policy issues raised by presidential appearances.[16] Rather, the Commission stated a new basis for its decision.

Although the Commission agreed that "CBS has acted in good faith" and "is to be commended for its concern,"[17] it faulted CBS for failing "to have exercised journalistic supervision to assure fulfillment of its purpose" of allowing the principal opposition party an opportunity to reply to the President on major issues discussed in prior presidential appearances.[18] The Commission held that, since Mr. Nixon's recent speeches had "largely concentrated" on the Indochina war issue, CBS should have taken steps to insure that the DNC broadcast similarly concentrated on this issue and should not have permitted Mr. O'Brien to devote as much time as he did to the other six issues previously discussed by the President.[19] In making this determination of "unresponsiveness," the Commission failed to explain why it limited its consideration solely to Mr. Nixon's five speeches on Vietnam. It did not consider, for example, other presidential speeches occurring both before and after these five, other forms of presidential appearances (such as press conferences), and televised presentations by administration spokesmen other than the President.[20]

Having found the broadcast to be "unresponsive," however, the Commission then concluded that it therefore fell within the ambit of the Commission's recent *Zapple* ruling,[21] which held that,

10. A. 4 (emphasis in original).

11. A. 4–10.

12. CBS pointed out, *inter alia*, that (1) RNC had conceded in the past that the national committee chairman of the principal opposition party was an appropriate spokesman to reply to the President (CBS noted that the then chairman of RNC had requested and received time in 1963 to respond to President Kennedy's televised discussion of tax legislation), A. 40–41; (2) the substantive issues covered in the July 7 broadcast had all been fully covered in presidential appearances, A. 34; (3) no showing had been made of any lack of fairness in the overall treatment by CBS of any of these issues, A. 34; and (4) as to RNC's contention that the O'Brien broadcast introduced a "fresh issue" as to which party should govern, CBS attempted to show that the President himself had addressed the "which party" issue in his prior broadcasts, A. 34–35.

13. The RNC reply, in substance, reiterated and amplified the arguments raised in its initial petition. A. 61–73.

14. 25 F.C.C.2d 283 (1970).

15. The other 4 complaints were concerned, in particular, with the extent to which fairness had been achieved by the 3 major commercial television networks in their coverage of the Indochina war issue. Part E of the August 18 opinion, ¶¶ 52–59, dealt with the RNC petition.

16. 25 F.C.C.2d at 301.

17. *Id.* at 300.

18. *Id.* at 300 n. 25.

19. *Id.* at 300.

20. These questions are considered in depth in a subsequent portion of this opinion. *See* text accompanying Notes 75–86, *infra.*

21. FCC letter to Nicholas Zapple, Communications Counsel, Senate Committee on Commerce, 23 F.C.C.2d 707 (1970).

where a broadcast licensee has sold time to supporters of a particular candidate during an election period, he may not decline to sell equivalent time to supporters of that candidate's opponents.[22] As a result, the Commission held that, although this was not a precise "equal opportunities" situation, since the DNC broadcast "did deal to some extent with the Cambodian issue, to which the President has made the five noted addresses," [23] "fairness requires CBS to extend some time to RNC or a partisan Republican spokesman, to answer matters raised in the DNC broadcast." [24]

On August 20, DNC filed a petition for reconsideration of the Commission's initial opinion.[25] In its petition, DNC urged that the July 7 broadcast was not intended by any of the parties involved as a response to the President on the war issue alone, as the Commission had "er-

roneously" assumed.[26] DNC contended that it had, in fact, responded to presidential appearances concerned with each of the issues discussed in the broadcast.[27] Attached to the petition were excerpts from the "Loyal Opposition" broadcast and corresponding excerpts from numerous televised appearances of the President on each of the issues involved.[28] DNC argued further that presidential use of television had created a serious imbalance and that the partial redress of that imbalance would be vitiated by an RNC reply to the O'Brien broadcast. It expressed a fear that the networks would be inhibited from carrying such DNC broadcasts in the future or would censor them to avoid the effects of the Commission's ruling.[29] RNC filed an opposition to the DNC petition on August 25,[30] to which DNC responded on September 9.[31]

22. In the *Zapple* ruling, the Commission also said that the *Cullman* aspect of the fairness doctrine would not apply to broadcasts on behalf of political candidates. In Cullman Broadcasting Co., 25 Pike & Fischer R. R. 895 (1963), the Commission held that a licensee could not avoid his responsibilities under the fairness doctrine because of an inability to obtain paid sponsorship for a response to a particular view on a controversial issue of public importance even though the initial presentation was sponsored. In other words, *Zapple* held that an imbalance in the financial resources of candidates could, in the public interest, give rise to an imbalance in their use of broadcast facilities.

23. 25 F.C.C.2d at 301.

24. *Ibid.* The result as to the RNC petition was concurred in by 5 of the 7 Commissioners, but 3 of the 5 issued separate statements reflecting widely disparate views. Commissioner Robert E. Lee stressed an alleged failure of CBS to limit Mr. O'Brien "to the issues originally raised," but he failed to identify the new issues he thought had been treated in the July 7 broadcast. Commissioner Lee also appeared to rest his conclusion in part on the selection of DNC as spokesman, contrary to the main opinion. The concurring opinion of Chairman Burch stressed the alleged "person or party" orientation of the O'Brien

broadcast, again without definition of that term. Chairman Burch asserted that the broadcast "covered issues in the political spokesman arena," but did not explain what he conceived that "arena" to be. Finally, Commissioner Johnson's concurrence, which was "extremely reluctant," was premised on the "content of the DNC program." However, he, like his brethren, failed to point to the particular content that troubled him.

25. A. 127. Simultaneously, DNC filed a motion for stay, which was subsequently withdrawn when CBS made clear that it would not afford time to RNC until CBS had exhausted its rights to review.

26. A. 132.

27. A. 137–138.

28. A. 144–190.

29. A. 130–131.

30. A. 192–202. RNC filed a petition for further relief on August 28, 1970, in which it asked the Commission to direct CBS to provide it with reply time on or before October 10, 1970, and that CBS give RNC notice at least 16 days in advance of the date on which the broadcast was to occur. A. 203–217. CBS filed an opposition and RNC a reply. In its September 24 order, the Commission denied the RNC petition in this respect. 25 F.C.C.2d at 746.

31. A. 280–290.

CBS also sought reconsideration of the August 18 order.[32] While conceding that the O'Brien broadcast was partisan, CBS argued that the broadcast had been devoted to vigorous discussion of specific issues. It pointed out that, contrary to the Commission's impression, CBS had not intended to limit the July 7 appearance to the Indochina war issue and that CBS had fully presented the views of the President and other members of his administration on all issues discussed by Mr. O'Brien on that broadcast.[33] Consequently, CBS urged, it would be grossly unfair to require that time be provided for a reply by the President's party to a prior reply to the President, since any such requirement would give the views of the President's party double exposure.[34] Finally, the CBS petition cited a precedent, completely ignored in the initial Commission order, that it asserted was controlling. In the *Hays* case,[35] CBS had denied a request by a Democratic Party spokesman for an opportunity to reply to a Republican response to President Johnson's 1968 State of the Union address. The Commission rejected a Democratic complaint that CBS had violated the fairness doctrine in refusing to provide time for a second Democratic broadcast. CBS asserted that *Hays* was essentially indistinguishable from the instant controversy.[36]

The RNC opposition to the CBS petition for reconsideration [37] stated that the "fundamental defect" of the CBS petition was its "refusal to recognize or accept the Commission's well-supported factual conclusion that the DNC broadcast of July 7, 1970, was partisan rather than issue-oriented." [38] RNC argued that the Commission's decision was not based on any imbalance created by the DNC broadcast with regard to discussion of public issues previously raised by the President, but solely on the ground that the DNC broadcast was partisan in nature. Further, RNC implicitly admitted that *Hays* was contrary to the Commission's August 18 ruling, but apparently suggested that it be overruled.[39] Upon completion of the pleadings,[40] the Commission, on September 24, 1970, released a memorandum opinion and order denying the DNC and CBS petitions for reconsideration.[41] Since the parties apparently had "misconstrued" its earlier ruling, however, the Commission decided to expound at greater length the reasons for that decision. The Commission made clear that the ruling was in no way based on the partisan content of the July 7 broadcast. To the contrary, in informing the public on issues raised in presidential broadcasts, "the presentation can be hard-hitting and partisan." [42]

The Commission conceded also that its August 18 ruling "did not take into ac-

32. A. 218–270 (September 3, 1970).

33. A. 221–222. CBS submitted an appendix detailing the discussion of these issues by Republican spokesmen by date, time and content. A. 243–265. CBS also pointed out that the presidential broadcasts to which Mr. O'Brien replied had constituted "a strong endorsement of Republican [Party] government" and contained remarks "extolling the virtues of the Republican Administration and commenting unfavorably on the positions or actions of the previous Democratic Administration and the current Democratic-controlled Congress." A. 226–227.

34. A. 239–240.

35. Letter from FCC Chairman Rosel H. Hyde to Congressman Wayne L. Hays, February 9, 1968, FCC Reference No. 8830–S, C2–105.

36. A. 234–239.

37. A. 271–279.

38. A. 271.

39. A. 274.

40. CBS filed a reply to the RNC opposition to its petition for reconsideration. A. 291–301.

41. 25 F.C.C.2d 739 (1970). The petitions were denied by a 4 to 2 vote. Commissioner Cox, who had concurred in the August 18 opinion, had since left the Commission. Commissioner Johnson concurred in the result, while Commissioner Bartley wrote a short dissenting statement. Commissioner H. Rex Lee dissented without opinion.

42. 25 F.C.C.2d at 745.

count the overall presentations of CBS on the issues covered in the July 7 DNC broadcast, and \* \* \* did not follow the general fairness doctrine pattern." [43] The order was founded, rather, on a "specific corollary" of the fairness doctrine—a new "political party" doctrine derived by the Commission from its *Zapple* ruling, *supra*. [44] Concerning the question of "responsiveness," the Commission held that appearances by Republican Party spokesmen on *news-type* programs were irrelevant in the political party situation. [45] As to the presidential addresses, the Commission reaffirmed its position [46] that such speeches are subject to the general fairness doctrine, [47] and that CBS therefore had wide latitude in fashioning counter-balancing programming. [48] However, although the Commission implicitly reversed its earlier assumption that CBS' offer of time to DNC was geared specifically to Mr. Nixon's televised addresses on the Indochina war issue, [49] it held that, since the President's appearances "had by far concentrated on [this issue] \* \* \* it would certainly seem that CBS—concerned to have the public informed on the issues covered by the President—would, first and foremost," direct Mr. O'Brien to present his party's views on Indochina. [50] In essence, then, the Commission ruled that CBS, having chosen not to dictate the content of the July 7 broadcast, could not "avoid the consequences of the 'political party' doctrine" when the O'Brien broadcast ranged beyond the issues previously raised by the President. [51]

Finally, the Commission never addressed itself to the contentions advanced by CBS concerning the *Hays* ruling. The

citation of *Hays* in a footnote, [52] however, indicates that the Commission intended to reaffirm *Hays*, evidently regarding it as distinguishable from the present case—although no basis for such a distinction was stated.

One last matter must be mentioned before turning to our resolution of the issues presented on this appeal. Although the Commission's brief, in line with the opinions below, strenuously argued that the "unresponsiveness" of the O'Brien broadcast gave rise to a right of reply in favor of RNC, at oral argument, to the astonishment of this court, counsel for the Commission urged that we disregard the responsiveness issue and, rather, that we uphold the Commission's order on a totally new ground—that an RNC reply is mandated simply because CBS failed to dictate to DNC the precise issues to be discussed, without regard to the actual content of the broadcast. We return to this matter below.

## II

Much of our evolving body of administrative procedure rests upon the cornerstone requirement of reasoned decision making. 2 K. Davis, Administrative Law Treatise § 16.12 (1958). Without such a requirement, effective judicial review would be impractical if not impossible, and administrative litigants and the public generally would be set adrift on a potential sea of unconscious preference and irrelevant prejudice. Moreover, judicial vigilance to enforce the rule of law in the administrative process is particularly crucial where, as here, the area under consideration is in a constant state of flux. Greater Boston Television Corp.

43. *Id.* at 742.

44. *Id.* at 742–743.

45. *Id.* at 743.

46. *See* California Democratic State Central Committee, 20 Pike & Fischer R.R. 867 (1960); Republican National Committee, 3 Pike & Fischer R.R.2d 767 (1964).

47. Non-campaign speeches of the President, however, were held to be exempt from the equal opportunities requirement of the "political party" situation. 25 F.C.C. 2d at 744.

48. *Ibid.*

49. *Ibid.*

50. *Id.* at 745.

51. *Ibid.*

52. *Id.* at 746 n. 16.

v. F.C.C., 143 U.S.App.D.C. 383, 394, 444 F.2d 841, 852 (1971).

■■ We do not challenge the Commission's well established right to modify or even overrule an established precedent or approach, for an administrative agency concerned with furtherance of the public interest is not bound to rigid adherence to its prior rulings.[53] Lodged deep within the bureaucratic heart of administrative procedure, however, is the equally essential proposition that, when an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law.[54] Moreover, as this court has emphasized, the Commission "must explain its reasons and do more than enumerate factual differences, if any, between * * * [similar] cases; it must explain the relevance of those differences to the purposes of the Federal Communications Act."[55] In our view, the Commission's treatment of the *Hays* case in the proceedings below was clearly violative of these basic tenets of administrative law.

The *Hays* ruling arose in the context of President Johnson's 1968 State of the Union address.[56] As it had done in the preceding two years, CBS invited Republican congressional leaders to respond to the President's address. CBS did not specify which of the many issues discussed by the President should be discussed on the program, require that those issues be discussed at all, or allocate time for presentation of any particular issue. The resulting one-hour broadcast covered a full panoply of issues, devoting a considerable amount of time to some issues treated only briefly by the President, while ignoring others he had examined at length.[57] Indeed, the 1968 Republican broadcast covered a range of issues at least as broad as, if not broader than, the range of issues discussed in the O'Brien broadcast.

The Commission, however, sustained CBS' refusal to provide time to Democratic congressional leaders to reply to the 1968 Republican broadcast. In so doing, the Commission relied upon traditional fairness doctrine principles, stating that its role was not to substitute its own judgment for that of the broadcaster, but rather to determine whether the licensee could be said to have acted in good faith in discharging its obligation to provide a balanced presentation of opposing viewpoints. The Commission concluded that CBS had acted within the wide discretion afforded it under the fairness doctrine, and therefore held that the Republican broadcast did not give rise to any reply-to-reply rights in favor of Democratic spokesmen.

53. *See, e. g.,* F.C.C. v. WOKO, Inc., 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946); F.T.C. v. Crowther, 139 U.S. App.D.C. 137, 140–141, 430 F.2d 510, 513–514 (1970); Capitol International Airways, Inc. v. C.A.B., 129 U.S.App. D.C. 187, 392 F.2d 511 (1968); Philadelphia Television Broadcasting Co. v. F.C.C., 123 U.S.App.D.C. 298, 359 F.2d 282 (1966); James S. Rivers, Inc. (WJAZ) v. F.C.C., 122 U.S.App.D.C. 29, 351 F.2d 194 (1965); Giant Food Inc. v. F.T.C., 116 U.S.App.D.C. 227, 322 F.2d 977 (1963). *See also* 2 K. Davis, Administrative Law Treatise § 17.07 (1958).

54. Secretary of Agriculture v. United States, 347 U.S. 645, 653, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); Greater Boston Television Corp. v. F.C.C., 143 U.S. App.D.C. 383, 394, 444 F.2d 841, 852 (1971); F.T.C. v. Crowther, *supra* Note 53, 139 U.S.App.D.C. at 141, 430 F.2d at 514; Marine Space Enclosures, Inc. v. F.M.C., 137 U.S.App.D.C. 9, 17, 420 F.2d 577, 585 (1969); Herbert Harvey, Inc. v. N.L.R.B., 128 U.S.App.D.C. 162, 385 F.2d 684 (1967); Greensboro–High Point Airport Authority v. C.A.B., 97 U.S.App.D.C. 358, 231 F.2d 517 (1956). *See also* 2 K. Davis, *supra* Note 53, § 16.12.

55. Melody Music, Inc. v. F.C.C., 120 U.S. App.D.C. 241, 244, 345 F.2d 730, 733 (1965). *See also* Burinskas v. N.L.R.B., 123 U.S.App.D.C. 143, 148, 357 F.2d 822, 827 (1966).

56. 4 Weekly Compilation of Presidential Documents (hereinafter "WCPD") 70–80 (1968).

57. 114 Cong.Rec. (Part 1) 882 (1968).

The facts of these two cases have that degree of parallelism which entitles both petitioners and this court to a full explanation from the Commission, and not from its counsel on appeal, as to why *Hays* "should be jettisoned without giving credence to the charge that similar supplicants receive dissimilar dispensations." F.T.C. v. Crowther, 139 U.S.App. D.C. 137, 141, 430 F.2d 510, 514 (1970). The question before us, then, is not whether the Commission could properly abandon or distinguish *Hays*, but rather whether it has sufficiently identified and articulated its reasons for doing so.

Although *Hays'* relevance to the instant controversy is readily apparent, the Commission failed even to mention it in its initial order of August 18. In an effort to rectify this situation and to compel the Commission to face up to *Hays*, the CBS petition for reconsideration dealt at length with the *Hays* question, asserting vigorously that *Hays* was a controlling precedent which must be squarely confronted by the Commission.[58] RNC's opposition to the CBS petition implicitly acknowledged the relevance of *Hays*, but suggested that it simply be overruled.[59] Undaunted, the Commission persisted in its attempt to sidestep the issue entirely. Rather than face up to the apparent conflict, the Commission's opinion of September 24 relegated its "discussion" of *Hays* to a mere citation in a footnote.[60] In so doing, the Commission sought to reaffirm its earlier ruling, in the apparent belief that *Hays* was reconcilable with the decision here under review. The Commission made no attempt, however, to articulate the basis for reconciliation.

Faced with two facially conflicting decisions, the Commission was duty bound to justify their coexistence. The Commission's utter failure to come to grips with this problem constitutes an inexcusable departure from the essential requirement of reasoned decision making.

The rule of law is intended to eliminate the appearance as well as the reality of arbitrariness, and if the public's faith in its administrative agencies is to be maintained, it is imperative that these agencies act in a wholly rational, logical fashion, completely free from even the appearance of bias, prejudice and improper influence. This is particularly true where, as here, the agency is functioning in the midst of a fierce political battle, where the stakes are high and the outcome can affect in a very real sense the political future of our nation.

The Commission's handling of this case does not mark its finest hour. Put to the test under pressure it waffled. Unable to articulate reasons for overruling or distinguishing *Hays*, the Commission effectively ignored its own obvious precedent. Under the circumstances, its arbitrary action may not stand.[61]

### III

■ Our reversal of the decision below, however, is not premised solely upon the Commission's mistreatment of *Hays*, for we find serious fault with other aspects of the opinion as well. In an apparent effort to avoid a direct confrontation with its earlier ruling in *Hays*, the Commission adopted a wholly unreasonable view of the factual setting of this controversy. By selecting rigid and arbitrary blinders, the Commission failed to see beyond Mr. Nixon's five speeches on Vietnam in evaluating the "responsiveness" of the O'Brien broadcast. The result, of course, was an arbitrary and therefore impermissible application of the Commission's own "responsiveness" doctrine.

■ Congress has delegated to the Commission the responsibility to ensure that broadcast licensees "operate in the public interest and * * * afford reasonable opportunity for the discussion of conflicting views on issues of public

---

58. A. 234–239.

59. A. 274.

60. 25 F.C.C.2d at 746 n. 16.

61. *See* authorities cited at Note 54, *supra.*

importance." [62] As a result, a court reviewing agency action is not at liberty simply to substitute its own judgment for that of administrative officers who have kept within the bounds of their delegated powers.[63] However, these powers are not boundless, and unless administrative action is tempered by judicial supervision, "expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion." [64]

Cognizant of the potential hazards of unbridled administrative discretion, Congress has wisely devised a scheme whereby "agencies and courts together constitute a 'partnership' in furtherance of the public interest." [65] Thus in the Administrative Procedure Act, 5 U.S.C. § 706 (1970), Congress chose to codify the long-standing rule that courts must "hold unlawful and set aside agency action * * * found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Our task here, then, is simply to determine whether the facts confronting the Commission rationally support its ultimate conclusion that the O'Brien broadcast was "unresponsive" to prior presidential addresses.[66]

■■■ In granting RNC a right to reply to the "Loyal Opposition" telecast, the Commission shunned all reliance on the traditional balancing principles of the fairness doctrine. Generally, the fairness doctrine requires "that discussion of public issues be presented on broadcast stations, and that each side of those issues must be given fair coverage." Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 369, 89 S.Ct. 1794, 1796, 23 L. Ed.2d 371 (1969). See Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949); Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance [Fairness Primer], 29 Fed.Reg. 10415 (1964). The licensee may exercise wide latitude "in determining what subjects should be considered, the particular format of the programs devoted to each subject, the different shades of opinion

62. Communications Act of 1934, § 315(a), 47 U.S.C. § 315(a) (1964).

63. *See, e. g.*, Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Farmers Educational & Cooperative Union v. WDAY, Inc., 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959); American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936); McCarthy v. F.C.C., 129 U.S.App.D.C. 56, 390 F.2d 471 (1968); Philadelphia Television Broadcasting Co. v. F.C.C., *supra* Note 53, 123 U.S.App.D.C. at 299–300, 359 F.2d at 283–284. *See also* 1 K. Davis, Administrative Law Treatise § 5.03 (1958).

64. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), *quoting* New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 96 L.Ed. 662 (1951) (dissenting opinion) (emphasis omitted). *See* Volkswagenwerk Aktiengesellschaft v. F.M.C., 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965).

65. Greater Boston Television Corp. v. F.C.C., *supra* Note 54, 143 U.S.App.D.C.

at 393, 444 F.2d at 851. *See* United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); Niagara Mohawk Power Corp. v. F.P.C., 126 U.S.App.D.C. 376, 383 n. 24, 379 F.2d 153, 160 n. 24 (1967).

66. While the exact bounds of the concept of arbitrary and capricious administrative action are not precisely defined in the Act, it is well settled that the core of the concept is the notion of rationality. *See, e. g.*, Burlington Truck Lines, Inc. v. United States, *supra* Note 64, 371 U.S. at 168, 83 S.Ct. 239, 9 L.Ed.2d 207; Greater Boston Television Corp. v. F.C.C., *supra* Note 54, 143 U.S.App.D.C. at 392, 444 F.2d at 850; F.T.C. v. Crowther, *supra* Note 53, 139 U.S.App. D.C. at 141, 430 F.2d at 514; Paducah Newspapers, Inc. v. F.C.C., 134 U.S. App.D.C. 287, 288, 414 F.2d 1183, 1184 (1969); Grace Line, Inc. v. F.M.B., 2 Cir., 263 F.2d 709, 711 (1959); Van Curler Broadcasting Corp. v. United States, 98 U.S.App.D.C. 432, 435, 236 F.2d 727, 730, cert. denied, 352 U.S. 935, 77 S.Ct. 226, 1 L.Ed.2d 163 (1956); Willapoint Oysters, Inc. v. Ewing, 9 Cir., 174 F.2d 676, 695, cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949).

to be presented, and the spokesmen for each point of view." Editorializing by Broadcast Licensees, *supra*, 13 F.C.C. at 1251. The Commission's role in this area "is not to substitute its judgment for that of the licensee * * * but rather to determine whether the licensee can be said to have acted reasonably and in good faith." Fairness Primer, *supra*, 29 Fed.Reg. at 10416.

This *carte blanche* licensee discretion has, however, been circumscribed in certain areas where it has been felt that an "equal opportunities" approach might better serve the end of fairness. Thus in Section 315 of the Communications Act,[67] Congress declared that a station permitting use of its facilities by one candidate for public office during a campaign period must, with certain exceptions, also make its facilities available to all other candidates for the same office on a comparable basis.

 Section 315, however, applies only "to campaign appearances by candidates, and not by family, friends, campaign managers, or other supporters." Red Lion Broadcasting Co. v. F.C.C., *supra*, 395 U.S. at 382, 89 S.Ct. at 1803. Thus to ensure that the spirit of the statutory requirement is not frustrated by discrimination in the sale of air time to the *supporters* of candidates, the Com-

mission, in its recent *Zapple* ruling,[68] held that where a station sells time to supporters of a particular candidate during an election campaign, it cannot refuse to sell time to supporters of his opponents.[69]

Arguing that "'electioneering' is a continuing process," [70] the Commission ruled below that the instant controversy must be governed by principles similar to those first enunciated in *Zapple*. Thus the Commission held that, whenever a spokesman for the party in opposition utilizes his broadcast time to discuss issues not previously raised in prior presidential appearances, the President's party is entitled to reply, without regard to the overall balance that may exist if *all* televised presentations were considered. On this appeal we need not, and indeed do not, decide whether adoption of such a rule is within the powers of the Commission. We hold simply that in the context of the present case the rule has been applied by the Commission in a wholly irrational and therefore impermissible manner.

The July 7 "Loyal Opposition" broadcast was structured around presentation of excerpts of previously aired presidential statements on various issues, followed by critical commentary or rebuttal by Mr. O'Brien as to each presidential state-

---

67. Communications Act of 1934, Tit. III, 48 Stat. 1081, as amended, 47 U.S.C. § 301 *et seq.* (1964). Section 315 reads in pertinent part:

"(a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

(1) bona fide newscast,
(2) bona fide news interview,
(3) bona fide news documentary (if the appearance of the candidate is

incidental to the presentation of the subject or subjects covered by the news documentary), or

(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. * * *"

68. FCC letter to Nicholas Zapple, *supra* Note 21.

69. Aside from these two instances, the equal opportunities approach has been applied also in both the "personal attack," *see* 32 Fed.Reg. 10303 (1967); Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), and "political editorial," *see* 47 C.F.R. § 73.123(c) (1971), situations.

70. 25 F.C.C.2d at 743.

ment.[71] The telecast covered seven separate topics—the Indochina war, economic policy, crime, civil rights, dissent, defense spending, and the environment. With the exception of Mr. O'Brien's treatment of the Vietnam war issue, however, the Commission deemed the broadcast "unresponsive" to prior presidential appearances.[72] In reaching this conclusion, the Commission considered only those speeches of the President which were televised in the period from November 3, 1969 to June 3, 1970.[73] During this period, the President made six televised speeches, five of which dealt exclusively with Indochina.[74]

As a result, the Commission held that, since Mr. Nixon's televised speeches "had by far concentrated on the Indochina war issue," the DNC broadcast should "first and foremost" have been geared to a discussion of that issue.[75] Mr. O'Brien's remarks as to the other six issues were deemed "unresponsive," thereby giving rise to a right to reply in favor of RNC. The Commission's analysis, however, grossly oversimplifies a problem of considerable complexity. That the President's speeches during a limited period of time "largely concentrated" on one issue does not negate the indisputable fact that the President, personally and through

71. *See* Note 4, *supra.*

72. In its initial opinion, the Commission made clear that this was not a precise equal opportunities situation because, at least as to the time devoted to discussion of the Indochina war issue, the O'Brien broadcast had indeed been "responsive." 25 F.C.C.2d at 301.

73. It is evident throughout both opinions below that the Commission considered only those speeches broadcast during this time period in reaching its determination of "unresponsiveness." *See* 25 F.C.C.2d at 299–301, 739–747. The Commission's decision to limit its consideration to this particular time period may be traced to its initial decision to dispose of the RNC complaint in conjunction with several other complaints which were in fact addressed specifically to the President's recent speeches on the Indochina war issue. Thus in the August 18 opinion the Commission stated that it had "grouped all these complaints because * * * they all involve a common problem—the discharge by broadcast licensees of their responsibilities under the fairness doctrine in dealing with the Indochina war issue." 25 F.C.C.2d at 291.

In the other complaints, the Committee for Fair Broadcasting, Fourteen United States Senators, and Business Executives' Move for Vietnam Peace all urged that network coverage of the presidential addresses on Vietnam (referring specifically to those speeches occurring between November 3, 1969 and June 3, 1970) required that they be given comparable time and format to present their opposing views. The Commission refused to order the networks to grant time to these complainants or to apply an equal opportunities requirement to presidential or

other official appearances. The Commission did hold, however, that format should be considered in determining whether a licensee had achieved overall fairness. Accordingly, in light of the imbalance created by the large number of presidential addresses on Vietnam, the Commission required the networks to make additional uninterrupted time available to spokesmen selected by the networks for discussion of the Indochina war issue. Thus consideration of the RNC complaint in this context may well have led the Commission to mischaracterize that complaint as one dealing particularly with the President's recent speeches on Vietnam.

74. The 5 speeches on Indochina were telecast on November 3, 1969, 5 WCPD 1546; December 15, 1969, 5 WCPD 1752; April 20, 1970, 6 WCPD 553; April 30, 1970, 6 WCPD 596; and June 3, 1970, 6 WCPD 721.

The 6th speech considered by the Commission was the President's January 26, 1970 appearance explaining his veto of a $20 billion appropriations bill for the Departments of Labor and Health, Education and Welfare. 6 WCPD 76. However, no weight was given to this address in the Commission's determination of "unresponsiveness." In addition, a 7th speech televised during this period, the President's January 22, 1970 State of the Union message, was not considered by the Commission in evaluating the responsiveness of the O'Brien broadcast. This was probably because Democratic congressional leaders had already been given an opportunity, on February 9, 1970, to reply to this particular address.

75. 25 F.C.C.2d at 745.

his spokesmen, had extensively expounded the administration's views in numerous televised presentations which the Commission arbitrarily ignored.

We fail to see the logic underlying the Commission's decision to limit its consideration solely to presidential speeches televised between November 3, 1969 and June 3, 1970. Indeed, the only discernible purpose served by such a decision is the creation of an *illusion* that Mr. Nixon had not previously addressed himself to the other six issues discussed in the O'Brien broadcast. Thus the Commission never even attempted to justify its choice of June 3, 1970 as the cutoff date. The O'Brien broadcast was aired on July 7, 1970, and CBS offered the time for the broadcast on June 22. This being so, we see no sense whatever in the Commission's refusal to consider a 22-minute appearance by Mr. Nixon on June 17, 1970,[76] which dealt, not with Indochina, but with the economy generally and with inflation and unemployment specifically —topics covered by Mr. O'Brien in the "Loyal Opposition" broadcast.[77]

Similarly, the Commission offered no explanation for its choice of November 3, 1969 as the starting date for its analysis. The July 7 presentation was, after all, the first "Loyal Opposition" type program to be carried by CBS during the Nixon administration other than the traditional response by Democratic congressional leaders to Mr. Nixon's 1970 State of the Union address.[78] Indeed, on several occasions prior to the July 7

broadcast CBS had rejected Democratic pleas for air time to reply to previously telecast presidential statements.[79] By selecting November 3 as a starting date, however, the Commission excluded consideration of numerous pre-November 3 presidential appearances, many of which dealt in whole or in part with issues other than the Vietnam war.[80]

Moreover, the Commission's analysis of the "responsiveness" issue was limited solely to an evaluation of presidential *speeches*. The opinions below made no attempt to explain why other types of presidential broadcasts—such as televised press conferences—should be ignored. In a footnote to its brief,[81] however, the Commission urges that such presentations should not be taken into account, apparently because the Commission believes they are not "voluntary, live, President-initiated appearances." This suggestion not only blinks reality; it is directly contrary to the Commission's treatment of press conferences in the past. The Commission has made clear, for example, that press conference type formats are to be taken into account in evaluating the proper balance under the fairness doctrine. *Cf.* Eugene J. McCarthy, 11 F.C.C.2d 511 (1968). Moreover, in Columbia Broadcasting System, Inc., 40 F.C.C. 395 (1964), the Commission squarely held that press conferences are substantially within the speaker's control, stating:

" * * * [N]ot only the scheduling, but in significant part, the content and

76. 6 WCPD 774.

77. *See* transcript of the July 7 broadcast, A. 23–31.

78. *See* Note 74, *supra.*

79. For example, CBS earlier refused Senate Majority Leader Mansfield's request for time to respond to the President's June 17, 1970 economic message. A. 140 n. 1.

80. On August 8, 1969, for example, the President delivered an extensive televised speech concerning welfare reform. 5 WCPD 1103. In addition, Mr. Nixon participated in numerous news conferences prior to November 3, 1969, dealing

with a wide range of issues. *See, e. g.,* 5 WCPD 175 (January 27, 1969) (inflation and recession, crime); 5 WCPD 225 (February 6, 1969) (civil rights, defense spending, environment); 5 WCPD 360 (March 4, 1969) (student dissent and national unity); 5 WCPD 400 (March 14, 1969) (defense spending, student dissent and national unity); 5 WCPD 878 (June 19, 1969) (inflation and recession, student dissent and national unity); 5 WCPD 1327 (September 26, 1969) (inflation and recession, civil rights, student dissent and national unity).

81. Respondents' brief at 3 n. 1.

format of the press conference is not under the control of the network. Thus, the candidate determines what portion of the conference is to be devoted to announcements and when the conference is to be thrown open to questions." [82]

Thus we see no reason why press conferences should not also be taken into account in the "political party" situation. Here, Mr. Nixon's press conferences broadcast over CBS both before [83] and during the eight-month period chosen by the Commission dealt substantially with issues other than Vietnam, including economic policy, student dissent and unity, crime, human resources and civil rights,[84] all subjects covered in Mr. O'Brien's "unresponsive" response.

■ Finally, although the Commission noted in a somewhat cursory fashion that appearances by Republican Party leaders "on news-type programs [do] not satisfy the fairness requirement in the 'political party' situation," [85] it failed ven to mention the relevance of televised presentations by *presidential spokesmen* on other than "news-type" programs. If the Commission wishes to adopt a "responsiveness" test in implementing its new doctrine, it must apply this test rationally, and a blanket exclusion of all appearances by presidential spokesmen

is simply not rational. The President speaks in many voices, and it makes no sense to pretend otherwise. In many instances the President's confidants—the Vice President, his cabinet officers, and other administration officials—present not only their own views as individuals, but also the views of the man they represent. Indeed, at times they speak subject to the direct authorization of the President himself. Thus the Commission's absolute exclusion of all such appearances cannot be sustained as a rational exercise of administrative discretion. And this is all the more true where, as here, many of these appearances dealt specifically with issues discussed in the "Loyal Opposition" broadcast.[86]

While we do not here rule on the propriety of the Commission's new "responsiveness" doctrine itself, we do note that in many instances its application, by creating a right to reply under *Zapple* even though no fairness doctrine imbalance actually exists, may have extremely harsh consequences, not only for the litigants themselves, but for society generally. It can hardly be doubted that the power of the media in shaping public opinion plays a paramount role in our present political process. Yet any misapplication of the Commission's new doctrine would seriously distort this power, providing the

82. 40 F.C.C. at 397. *See also* McCarthy v. F.C.C., *supra* Note 63.

83. *See* Note 80, *supra*.

84. *See, e. g.*, 5 WCPD (November 5, 1969) (inflation and recession, crime) ; 5 WCPD 1720 (December 8, 1969) (civil rights, spending, student dissent and national unity) ; 6 WCPD 76 (January 26, 1970) (inflation and recession, civil rights) ; 6 WCPD 616 (May 8, 1970) (unemployment, student dissent and national unity).

85. 25 F.C.C.2d at 743.

86. For example, presidential spokesmen have frequently appeared on CBS' *Face the Nation*. *See, e. g.*, A. 248, 252 (Vice President Agnew) (February 1, 1970) (dissent, equal rights, crime) ; A. 249, 252 (Vice President Agnew) (May 3, 1970) (dissent, crime) ; A. 249, 250,

255 (Herb Klein, Director of Communications) (May 24, 1970) (dissent, economy, human resources) ; A. 251–252 (Dr. Paul McCracken, Chairman of the President's Council of Economic Advisors) (June 21, 1970) (economy) ; A. 254–256 (Daniel P. Moynihan, Counselor to the President for Domestic Affairs ; Robert Finch, former Secretary of Health, Education and Welfare ; Walter Hickel, former Secretary of the Interior) (January 25, 1970) (environment). It might be argued that such appearances should not be considered in this context since they are generally balanced by similar appearances by Democratic spokesmen. However, the issue under the Commission's new doctrine is "responsiveness," not "balance." If an imbalance was created by the O'Brien broadcast, that should properly be treated under the fairness doctrine, not the more stringent "equal opportunities" rule.

President's party with "two bites of the apple"—with twice the opportunity to influence public opinion as its critics. Such a result strikes at the heart of representative democracy and imperils the very traditions upon which this nation is founded.

To avoid these consequences, it is imperative that the Commission exercise extreme caution in applying its new rule. A right to reply, in this context, should be granted only after an exhaustive examination of the relevant facts. The Commission, however, in constructing its new rule in an apparent effort to circumvent its earlier ruling in *Hays*, dealt with with these facts in a notably shoddy fashion, arbitrarily ignoring many critical aspects of the factual setting in which this controversy arose. The Commission's determination of "non-responsiveness" cannot, therefore, be sustained.

IV

Finally, in a gallant, yet misguided, effort to "save" the Commission's ruling, counsel for the Commission at oral argument abruptly changed gears, urging, contrary to the primary contentions in his brief, that we uphold the ruling on a new and highly strained interpretation of the opinions below.[87] Apparently inspired by a belated recognition of the pervasive irrationality of the Commission's treatment of the "responsiveness" issue, counsel seeks now to abandon that approach entirely, substituting instead what may fairly be termed a "specification of issues" rationale. Thus it is urged that RNC's reply rights derived not from any lack of responsiveness of

the O'Brien broadcast but, rather, solely from the alleged failure of CBS to dictate to DNC the precise issues to be discussed, without regard to the actual content of the broadcast.

We are cited to several passages from the Commission's opinions as supportive of this new interpretation. Typical of these is the Commission's statement that the July 7 broadcast "was 'party-oriented' rather than 'issue-oriented,' because of CBS' abstention in this critical area of issues to be covered."[88] Taken out of context, such declarations may indeed seem to support the logic of counsel's position. When placed in their proper perspective, however, these statements are seen to relate to the "responsiveness" approach actually adopted. Thus it is true that as a factual matter CBS' failure to "exercise journalistic supervision" led to the grant of reply time to RNC, but only because the resulting broadcast was itself deemed unresponsive. In other words, CBS could have avoided this result had it specified the *proper* issues to be discussed; its failure to do so *enabled* Mr. O'Brien to make an "unresponsive" presentation.[89] Viewed in this manner, it is clear that the Commission did not attach to those facts the legal significance which counsel seeks now to transmogrify into dogma. These statements were mere factual descriptions, not legal doctrine.

We therefore cannot accept counsel's new and thoroughly distorted interpretation of the opinions below. This being so, we are powerless to affirm the Commission's ruling on this

87. Commission counsel, Mr. Ohlbaum, is well and favorably known to this court. Our references to his efforts to save the Commission's opinions are not intended as a reflection on him.

88. 25 F.C.C.2d at 745.

89. Indeed, a recent Commission decision lends support to this view of the opinions below. In Democratic National Committee, —— F.C.C.2d —— (FCC No. 71–882, August 20, 1971), RNC sought time to reply to a Democratic broadcast telecast on April 22, 1971 by the American Broadcasting Company. The Commission rejected the RNC demand, however, finding the situation there distinguishable from the instant controversy. In so finding, the Commission noted that *Zapple*, as extended by the Commission's decision in this case, "applies only to appearances by party spokesmen in response to Presidential appearances when the licensee does not specify the issues to be treated *as those which were discussed by the President*." Slip opinion at 7, ¶ 14. (Emphasis added.)

"specification of issues" rationale, for it is well settled that a reviewing court "may not accept appellate counsel's *post hoc* rationalizations for agency action" as a basis for affirmance. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed. 2d 207 (1962). The decision must stand or fall "solely [on] the grounds invoked by the [Commission]." S.E.C. v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). *See* N.L.R.B. v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).

 Moreover, even if we were to accept as valid counsel's novel construction of the opinions below, the decision still could not be affirmed on that basis, for the "specification of issues" rule would itself fail the primary test of rationality.[90] Under the asserted rule, had CBS prescribed in advance the precise issues Mr. O'Brien actually discussed, no reply rights would have arisen. Yet it is clearly irrational to suggest that the mere failure to specify issues, by itself, somehow fundamentally alters the basic nature of the broadcast when its content remains entirely unchanged.

Whether the issue is viewed as one of fairness on the substantive issues discussed or equality of opportunity as between political parties, there is no discernible relationship between the existence of instructions to a party spokesman as to the specific issues he should discuss and the fairness of the coverage achieved. A partisan broadcast is not made more "party-oriented" simply because the issues covered are selected by the spokesman rather than by the network. The question of fairness cannot so readily be divorced from the actual content of the broadcast.

Finally, it is highly questionable whether the mandate to broadcasters inherent in this "specification of issues" rationale to dictate, censor or restrict partisan political spokesmen in their televised presentations accords with the commands of the First Amendment. The public must be equipped to make hard choices between competing political philosophies. This end is best served when there is robust debate among the people most directly involved—the spokesmen themselves—not where the operator of a federally licensed facility must circumscribe that debate as a condition precedent to airing it at all. *See* Red Lion Broadcasting Co. v. F.C.C., *supra.* Moreover, since presidential addresses are governed solely by the fairness doctrine, and not by the "specification of issues" rationale, the Commission's extension of *Zapple* is essentially a one-way street. This is particularly dangerous where, as here, application of the "specification of issues" doctrine would require reply time for the party in power even though there exists neither a fairness doctrine imbalance nor a lack of responsiveness as to the particular issues discussed in the initial broadcast. Such a result is certainly contra-fairness, and raises serious questions concerning the requirement of governmental neutrality in the area of the First Amendment. *Cf.* Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267, 280 (1951). For all these reasons, then, we must reject counsel's brave last-ditch effort to salvage the Commission's ruling.

The sudden promulgation of the "specification of issues" justification for the ruling below is just one more step in the Commission's seemingly endless attempt throughout these proceedings "to vindicate its own idiosyncratic conception of the public interest [and] of the requirements of free speech." Red Lion Broadcasting Co. v. F.C.C., *supra*, 395 U.S. at 395, 89 S.Ct. at 1809. Yet the need for an informed public opinion—the great driving force underlying any working democracy—is simply too great to be subjected to the vagaries of irrational and arbitrary decision making. We conclude, therefore, that the ruling below, marked

---

90. *See* authorities cited at Note 66, *supra.*

as it is by a succession of factual distortions and shifting justifications, must be reversed and the order of the Commission vacated.

So ordered.

TAMM, Circuit Judge (concurring):

The administrative process requires that government agencies and commissions issue reasons for their actions. Here the Commission has outdone itself by giving four reasons for its action— albeit different reasons at each step of the proceedings. In its initial order the Commission ruled that Columbia Broadcasting System was bound to grant time to the Republican National Committee because Chairman O'Brien referred only briefly to the war in his statement and because "The Loyal Opposition" was party-oriented rather than issue-oriented, thereby bringing this case within the Commission's *Zapple* [1] ruling. C.B.S. and D.N.C. petitioned for a rehearing based upon their claim that the Commission had overlooked its own decision in *Hays*. [2] In response, the Commission denied the petition for rehearing on a new ground—the failure of C.B.S. to specify which issues O'Brien could raise during the broadcast. The Commission, based on the theory that " 'electioneering' is a continuing process" (A. 309), applied a "specific corollary" of the fairness doctrine known as the "political party" doctrine as contained in *Zapple*. (A. 308). The Commission stated, *inter alia:*

> However well-intentioned CBS was, the result here was simply the "political party" situation which we described at the outset. It was "party-oriented" rather than "issue-oriented," *because of CBS' abstention in this critical area of issues to be covered.*

(A. 311, emphasis supplied, footnotes omitted.)

In its brief the Commission chose to change its position yet a third time. It claimed that special circumstances had rendered the general doctrine inadequate to assure reasonable opportunity for the public to receive conflicting views. These circumstances, *viz.,* a speech by a candidate, political editorializing, or a speech by a candidate's supporters, limit the broadcaster's discretion. *The FCC was not concerned with CBS' overall fairness.* It claimed that O'Brien's presentation was not responsive and that CBS had failed to assure that it would be. Even though the FCC was cognizant that the President's numerous speeches created an imbalance on the war issue requiring presentation of the other side of the coin, CBS' fatal error, it said, was in granting time to D.N.C. for any purpose without supervision. Therefore, the only imbalance, the Commission contended, was one created by CBS in failing to give R.N.C. time to respond to D.N.C. Not satisfied with even this position as espoused in the briefs, the Commission made an eleventh-hour change in its game plan at oral argument. As Judge Wright points out, the Commission urged that we entirely disregard the responsiveness issue raised in the briefs and affirm the FCC on one ground and one ground only—failure of CBS to instruct D.N.C. on precisely which issues to raise during the broadcast.

I can neither accept nor sympathize with the manner in which the Commission has handled this litigation. They have created a debacle in seeking a sound basis for their decision. They have been unable to bring the case at bar within *Zapple* and have been similarly unable to distinguish it from *Hays*. Their opinions at the hearing level as well as the position urged in the briefs and at oral argument show a capricious, arbitrary and inconsistent approach to this case. The Commission cannot constantly change its position *quocumque modo velit.* I feel constrained to sound a trumpet in warning against such attempts by administrative agencies to play

---

1. Letter to Nicholas Zapple, 23 F.C.C.2d 707 (1970).

2. Letter from Chairman Rosel H. Hyde to Hon. Wayne Hays, Commission Ref. No. 8330–S; C2–105 (1968).

fast and loose with their opponents and the court. This court will not be made a party to the type of sham proceeding the FCC has attempted to create by its inconsistent changes in position. Once the FCC enunciated its position on the issue of R.N.C.'s right to reply it should have possessed the courage of its convictions to uphold that position and the reasons tendered therefor, or if convinced of its error, reversed its position rather than attempting to obfuscate both the issues and the Commission's reasoning. This failure to reach any coherent approach and the constant shifting of stance by the Commission leads me, although hesitantly, to conclude that by giving one political party two bites of the proverbial apple for every one granted to the opposing political party the Commission has taken a political role of interference contrary to all of the teachings of administrative decision-making.[3]

---

3. *See generally* 1 K. Davis, Administrative Law Treatise, § 1.03 (1958).